UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| [UNDER SEAL],<br><br>                    Plaintiffs,<br><br>        v.<br><br>[UNDER SEAL],<br><br>                    Defendants. | Case No.<br><br>COMPLAINT<br><br><br><br>**FILED IN CAMERA AND UNDER SEAL<br>PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

**DOCUMENT TO BE KEPT UNDER SEAL**

Anand Swaminathan
anand@loevy.com
Vince Field
vince@loevy.com
LOEVY & LOEVY LLP
312 N. May Street #100
Chicago, IL 60607
Tel: (312) 243-5900

Colette G. Matzzie
cmatzzie@phillipsandcohen.com
Molly B. Knobler
mknobler@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Ave, NW
Washington, DC 20036
Tel: (202) 833-4567

Avi Kumin
kumin@kmblegal.com
KATZ, MARSHALL AND BANKS, LLP
1718 Connecticut Ave. NW, 6th
Washington, DC 20009
Tel: (202) 299-1140

Claire M. Sylvia
csylvia@pcsf.com
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000


Attorneys for [under seal]

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CHRISTOPHER HARVEY,<br><br>                              Plaintiffs,<br><br>        v.<br><br>AAR CORP. and AAR AIRLIFT GROUP, INC.,<br><br>                              Defendants. | Case No.<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT<br><br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff-Relator Christopher Harvey, through his attorneys, on behalf of the United States of America (the "Government"), for his Complaint against Defendants AAR Corp. and AAR Airlift Group, Inc. (collectively "Defendants" or "AAR"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.    **INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and caused to be made by Defendants and/or their agents and employees in violation of the federal False Claims Act, 31 U.S.C. §§ 3729-33.

2.      As alleged herein, Defendant AAR Corp. and its subsidiary AAR Airlift, a major provider of aviation services and technological products and services to the government, and the aerospace and defense industries, has defrauded United States Transportation Command by submitting claims falsely representing that it has performed inspection and maintenance on its fleet of aircraft transporting United States troops and cargo as required by multiple DOD contracts, DOD air quality and safety regulations, and FAA regulations.

3.      Founded in 1951, AAR Corp. has annual revenues of over $2 billion and more than 6,000 employees in 17 countries.

4.      In early 2010, in an effort to expand its business to include providing airlift services for the Department of Defense, AAR Corp. purchased Aviation Worldwide Services from Xe Services LLC, the air operations arm of the company formerly known as Blackwater.

5.      At the time, Aviation Worldwide Services' subsidiary Presidential Airways provided fixed- and rotary-wing expeditionary flight operations, transporting personnel and cargo in support of Department of Defense (DOD) and Department of State deployments.

6.      Through the acquisition of Presidential Air, AAR Corp. acquired approximately forty-five fixed-wing planes and helicopters (Casa C-212s, Casa C-235s, Sikorsky S-61s, Sikorsky S-92s, Puma SA330Js, De Havilland DHC-8s, Bell 412s, and Bell 214STs).

7.      AAR Corp. also assumed Presidential Air's DOD contracts to provide expeditionary airlift services, including operational support services, for United States troops and cargo, primarily in Afghanistan.  These DOD contracts are administered mainly by the United States Transportation Command, headquartered at Scott Air Force Base.

8.      AAR Corp. created subsidiary AAR Airlift Group to perform on the DOD contracts for expeditionary airlift services previously held by Presidential Air.  AAR Airlift transferred Presidential managers and employees, including all employees tasked with tracking inspection and maintenance requirements for the Presidential aircraft to AAR Airlift's facility in Melbourne, Florida.

9.      Since the 2010 acquisition of Presidential Air, AAR has become a major supplier of intra-theater airlift services for United States' troops, supplies and mail in the Middle East, Africa and in the Western Pacific.

10.     Under its DOD contracts, with some variation, AAR must be prepared to perform missions for transport of troops and cargo as scheduled by the Government with limited advance notice.  Typically, AAR must meet an 85% "schedule reliability rate." Airlift missions must depart on-time as scheduled by the Government and departures may not be delayed for reasons within AAR's control including maintenance, for more than 15% of all airlift missions scheduled by the Government within a month.

11.     AAR's DOD contracts also require that aircraft used for airlift missions be properly inspected and maintained in accordance with DOD quality and safety criteria for airlift

4

services and FAA regulations including FAA Airworthiness Directives and air carrier and manufacturer requirements for tracking and replacement of life-limited parts.

12.     AAR must operate in full compliance with the DOD Commercial Air Transportation Quality and Safety Review Program, 32 C.F.R. Part 861, to remain eligible for payment under its DOD contracts.  When AAR took over Presidential's operations from Blackwater in 2010, it discovered that Presidential's inspection and maintenance program did not meet DOD and FAA requirements and had not been properly used to inspect and maintain aircraft.

13.     Internal reviews of the Presidential aircraft by AAR uncovered dozens, if not hundreds, of serious maintenance issues including failure to schedule timely inspection and replacement of many life-limited aircraft parts.

14.     During the transition from Presidential, AAR found that it was difficult to meet schedule reliability rates under its DOD contracts with the aircraft inherited from Presidential. AAR knew that, if it revealed to DOD the scope of the maintenance failures on the aircraft AAR had purchased from Presidential or if it failed to meet schedule reliability rates required under the DOD contracts, DOD could reduce payments or terminate AAR's contracts.

15.     AAR also knew that if its extensive problems with maintenance and safety were revealed to U.S. Transportation Command, it would likely be at a competitive disadvantage in bidding for new contracts including the contract awarded in May 2014 to provide rotary-wing support to the U.S. Africa Command.

16.     Rather than taking the time and investing the resources to ground planes and ensure proper maintenance of each aircraft, AAR chose to halt internal reviews of the aircraft and to conceal from DOD and FAA that the aircraft purchased from Presidential had serious

safety and maintenance issues and that there was no compliant maintenance and inspection program in place to address these issues.

17.     As a result, since 2010, AAR has knowingly operated aircraft that suffer from multiple serious safety and maintenance failures and that do not meet FAA airworthiness requirements to transport United States troops and cargo on a daily basis.

18.      In addition, AAR has continued Presidential's reckless practices and has not implemented an inspection and maintenance program that complies with its DOD contracts and DOD and FAA regulations.

19.     As a result of its failure to properly implement the inspection and maintenance programs required by contract and regulation, AAR has failed to perform required maintenance and safety inspections, failed to track and replace life-limited parts, failed to implement FAA Airworthiness Directives, failed to ensure essential emergency safety equipment is on board its aircraft, and has made unapproved major alterations to aircraft including installation of unapproved parts.

20.     Relator, in his role as a Lead Conformity Specialist for AAR Airlift, repeatedly identified to his managers significant safety and maintenance issues that could risk the safety of troops being transported on AAR aircraft.

21.     Relator identified dozens of life-limited parts that were not being properly tracked or replaced on AAR aircraft transporting United States troops and cargo.

22.     Relator raised his concerns internally through successive levels of AAR management including directly with the Vice President of Safety for AAR Airlift, Tom Howell, the Vice President of Quality for AAR Corp., Art Smith, and the President and CEO of AAR Airlift, Randy Martinez.

6

23.     Despite extensive and detailed knowledge of these multiple safety and maintenance failures AAR refused to take corrective action to implement an inspection and maintenance program for its aircraft as required by contract and regulations.

24.     Instead, AAR chose to transport United States troops and cargo on aircraft with expired parts and known safety hazards.

25.     AAR's fraudulent scheme concealed from the United States, among other things, its failure to track and replace life-limited parts, including elevator bolts on its fleet of Casa C-212s; its failure to perform timely overhaul of engine components, major assemblies, and gearbox supports on its fleet of Puma 330s; the illegal modifications to emergency safety systems on its fleet of Puma 330s; and its failure to track and inspect landing gear components on its fleet of Sikorsky S-61s.

26.     As part of its fraudulent scheme, AAR repeatedly represented to DOD personnel that aircraft were "mission ready" when AAR knew they were not.

27.     Defendants' conduct alleged herein violates the federal False Claims Act.  The federal False Claims Act (the "FCA") was originally enacted during the Civil War.  Congress substantially amended the Act in 1986 – and, again, in 2009 and 2010 – to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it.  The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.  Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

28.     The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; and (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim.  31 U.S.C. §§ 3729(a)(1)(A) and (B).  Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).

29.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

30.     As alleged herein, Defendants have submitted, and caused to be submitted, hundreds of false or fraudulent claims under its contracts for airlift services with the DOD.

31.     The United States has suffered, and continues to suffer, financial damage through the ongoing presentment by AAR of false or fraudulent claims for airlift services.

32.     This is also an action to recover damages suffered by Plaintiff-Relator Harvey as a result of AAR's unlawful retaliation against him for his having engaged in protected activity by opposing, investigating, and attempting to stop violations of the law, pursuant to the anti-retaliation provisions of the False Claims Act, the Sarbanes-Oxley Act, the Dodd-Frank Act, and the Florida Whistleblower Act.

33.     Based on the FCA, *qui tam* plaintiff Christopher Harvey seeks, through this action, to recover all available damages, civil penalties, and other relief for the federal violations alleged herein.

II.    **PARTIES**

34.    Plaintiff-Relator Christopher Harvey ("Relator") is a resident of Dallas, Texas. Relator has spent his entire professional career in the aviation industry.  Relator graduated from Bridgewater State College in 1994 with a Bachelor of Science Degree in Aviation Management. In the same year, he became an FAA licensed private pilot.  Over the last 20 years Relator has worked as an FAA licensed aircraft dispatcher, maintenance planner, senior records administrator, and conformity specialist for several airlines.  Accordingly, Relator has extensive experience in aircraft maintenance and flight operations under Parts 135 and 121 of the Federal Aviation Regulations.

35.    From October 2010 through June 2013, Relator worked as a Conformity Specialist for Defendant AAR Airlift Group, Inc. in Melbourne, Florida.  In March 2011, Relator was promoted to Lead Conformity Specialist.

36.    The job of an Aircraft Conformity Specialist is to ensure, through a meticulous process, that an aircraft is airworthy and maintained in accordance with FAA regulations, air carrier maintenance programs, manufacturer maintenance manuals, and Airworthiness Directives.  Aircraft Conformity Specialists are also responsible for ensuring that all inspections are performed in a timely manner and that all records associated with the aircraft's maintenance and scheduled replacement of life-limited parts are maintained properly.

37.    In June 2013, AAR transferred Relator to work as an Analyst in AAR Airlift's TRAX Department.  In this role, Relator assisted with the migration of data from AAR Airlift's legacy system for tracking aircraft maintenance, WinAir, to its new fleet management system, TRAX, and reviewing that data.

9

38.     AAR Airlift terminated Relator in July 2014 after he reported internally and to the FAA AAR's failure to maintain its aircraft in an airworthy condition.

39.     Defendant AAR Corp. is headquartered in Wood Dale, Illinois.  AAR Corp.'s aviation services division maintains a team of 2,000 Aviation Maintenance Technicians worldwide providing its customers more than five million hours of aircraft maintenance support per year.

40.     As relevant here, through its operating subsidiary AAR Airlift Group, Inc., AAR Corp. provides expeditionary airlift services to the United States and other government customers.  These fixed- and rotary-wing flight operations are performed primarily to transport personnel and cargo in support of the Department of Defense.

41.     AAR Corp.'s sales to the U.S. government and their contractors totaled $694.9 million in fiscal year 2014, $763.2 million in fiscal year 2013, and $888.5 million in fiscal year 2012.

42.     Defendant AAR Airlift Group, Inc. ("AAR Airlift") is an operating subsidiary of Defendant AAR Corp.   It is headquartered in Palm Bay, Florida.

43.     AAR Airlift Group is certified by the DOD Commercial Airlift Review Board (CARB) as eligible to do business with the DOD for air transport services.  AAR Airlift Group also is certified by the Federal Aviation Administration (FAA) for Part 133 external load operations (rotary-wing), Part 135 air carrier operations, and Part 145 repair station operations.

44.     Defendants AAR Corp. and AAR Airlift Group, Inc. shall be referred to collectively as "AAR."

III.   **JURISDICTION AND VENUE**

45.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

46.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the allegations or transactions alleged in this Complaint.  Even if there has been a statutorily relevant public disclosure, Relator is the original source of the information, which derives from his work for AAR Airlift.  Relator has direct and independent knowledge of the information that forms the basis of this Complaint and his information materially adds to any information that may have been the subject of a statutorily relevant public disclosure.  Relator voluntarily disclosed the information to the Government at least as early as August 2013 and before filing this Complaint.

47.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), as one or more Defendants can be found in, reside in, transact business in, and have committed acts related to the allegations in this Complaint in the Southern District of Illinois.

48.     Venue is proper, pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391, as one or more Defendants can be found in, reside in, and/or transact business in the Southern District of Illinois, and because many of the violations of 31 U.S.C. § 3729 occurred within this judicial district.

IV.   **BACKGROUND**

49.     To contract for airlift expeditionary services with U.S. Transportation Command ("USTRANSCOM"),  AAR must adhere to the following requirements: (1) the DOD criteria for maintaining eligibility to do business with DOD including all DOD air carrier quality and safety

regulations set forth at 32 C.F.R. Part 861; (2) the requirements of the air carrier certificate under which AAR Airlift operates pursuant to 49 U.S.C. Part 447; (3) all relevant Federal Aviation Regulations ("FARs"), including FAR Parts 43, 119  and 135; and (4) the written terms of its contracts with USTRANSCOM and the Military Sealift Command, including, as relevant, USTRANSCOM'S Federal Acquisition Regulations.

50.     These overlapping regulatory schemes require AAR to strictly implement and adhere to an air carrier maintenance program which must include tracking and replacement of life-limited parts as part of an ongoing, continuous system of ensuring the airworthiness of aircraft used under DOD contract for airlift expeditionary services.

51.     The regulations requiring air carriers contracting with USTRANSCOM to maintain airworthy, safe and reliable aircraft are intended to protect the safety of United States troops and to provide for effective transportation of cargo needed for U.S. military missions.

### A.     AAR's Contracts with U.S. Transportation Command

52.     Since at least 2010 when AAR Corp. acquired Presidential Airways and its contracts, AAR Airlift has performed and been paid under at least eight contracts with USTRANSCOM as set forth below.

53.     Around October 2007, USTRANSCOM awarded an indefinite-delivery, fixed price contract (#HTC711-08-D-0010) to Presidential Airways to provide "all fixed-wing aircraft, personnel, equipment, tools, materials, maintenance, and supervision necessary to perform passenger, cargo and combined Short Take-Off and Landing (STOP) air transportation services between locations in the Area of Responsibility (AOR) of Afghanistan, Kyrgyzstan, Pakistan, and Uzbekistan."  AAR Airlift began performing under this contract after its acquisition of

Presidential Airways. To date, the Department of the Army has awarded over $78 million under this contract.

54.     Around January 2008, USTRANSCOM awarded an indefinite-delivery, fixed price contract (#HTC711-08-D-0014) to Presidential Airways to provide "all fixed-wing aircraft, personnel, equipment, tools, material, maintenance, and supervision necessary to perform two simultaneous missions" for any missions in Afghanistan, Uzbekistan, Pakistan, and Kyrgyzstan the DOD elected to support with commercial passenger and cargo air transportation services. AAR Airlift began performing under this contract after AAR's acquisition of Presidential Airways. To date, the Department of the Army has awarded over $25 million under this contract.

55.     Around December 2008, USTRANSCOM awarded an indefinite-delivery, fixed price contract (#HTC711-09-D-0021) to Presidential Airways to provide rotary wing transport services in Afghanistan. AAR Airlift began performing under this contract after AAR's acquisition of Presidential Airways. In December 2012, USTRANSCOM exercised a renewal option under the contract to retain AAR Airlift's services through November 2013. This contract renewal had a value of approximately $143 million. AAR Airlift performed under this contract using at least 10 heavy-lift Sikorsky S-61 helicopters and two medium-lift Puma SA 330J helicopters. To date, the Department of the Army has awarded over $520 million under this contract.

56.     Around June 2010, USTRANSCOM awarded an indefinite-delivery, fixed price contract (#HTC711-10-D-R016) to Presidential Airways to provide airlift services to Central Command. AAR Airlift began performing under this contract after AAR's acquisition of Presidential Airways. USTRANSCOM exercised renewal options under this contract several

times to continue AAR Airlift's services.  In June 2012, USTRANSCOM exercised a renewal option worth $104 million to continue services through May 31, 2013.  In June 2013, USTRANSCOM exercised a renewal option worth $98 million to continue services through May 31, 2014.  In May 2014, USTRANSCOM exercised a renewal option worth approximately $50 million to continue services through May 31, 2015.  AAR Airlift has performed under this contract utilizing 12 to 15 fixed-wing aircraft from its fleet.  To date, over $276 million has been awarded under this contract.

57.     Around September 2010, USTRANSCOM awarded an indefinite-delivery, fixed price contract (#HTC711-10-D-R026) to Presidential Airways to provide rotary wing transport services in Afghanistan.  AAR Airlift began performing under this contract after AAR's acquisition of Presidential Airways.  USTRANSCOM exercised renewal options under this contract several times to continue AAR Airlift's services.  In November 2012, USTRANSCOM exercised a renewal option worth $161 million to continue services through November 2013.  In November 2013, USTRANSCOM exercised a renewal option worth $156 million to continue services through October 31, 2014.  AAR Airlift performed under this contract utilizing at least 10 rotor-wing aircraft from its fleet, including, at certain points, two Sikorsky S-92s, six Sikorsky S-61s, and two Bell 214 ST10 helicopters.  To date, over $513 million has been awarded under this contract.

58.     Around November 2013, USTRANSCOM awarded an indefinite-delivery, fixed price contract (#HTC711-14-D-R026) to AAR Airlift to provide fixed-wing air support in the Central Africa Region.  The contract was valued at $23 million and included a base period of seven months with five three-month renewal options.  Performance began in June 2014.

59.     Around May 2014, USTRANSCOM awarded two additional contracts to AAR Airlift.  One was to provide rotary-wing support to the U.S. Africa Command.  The total value of the contract inclusive of optional task orders is $34 million.  Performance on this contract began in October 2014.  The second contract is to provide rotary-wing support to the U.S. Navy through replenishment services in the Mediterranean, primarily for the 5th fleet.  This contract is valued at $34 million and includes a base one-year period beginning October 1, 2014 with four one-year options.

**B.      AAR's Contracts with Additional Federal Government Clients**

60.     In addition to its contracts with USTRANSCOM, AAR Airlift has performed and billed under at least two contracts with the Military Sealift Command.  The Military Sealift Command provides ocean transportation for the U.S. Navy and other components of the U.S. Armed Forces.  These contracts call for AAR to provide vertical replenishment services (*i.e.*, bringing supplies to seaborne vessels by helicopter).

61.     In addition, AAR Airlift was awarded a $34 million contract around November 2013 to provide fixed-wing and rotary-wing support to the Afghan National Security Forces through the NATO Training Mission and Combined Security Transition Command.  The Combined Security Transition Command is the financial and administrative conduit for U.S. funds used to further operations in Afghanistan.

62.     AAR Airlift has been awarded and/or performed under additional contracts with the U.S. government that were affected by the fraudulent conduct alleged herein.

15

**C.      AAR's DOD Contracts Require it to Maintain "Mission-Capable" Aircraft Ready to Provide Airlift Services as Needed**

63.      AAR's expeditionary airlift contracts with USTRANSCOM generally require it to supply and maintain sufficient fixed-wing and/or rotary aircraft to provide any necessary airlift services for DOD personnel and cargo throughout the relevant command area of responsibility.

64.      With some variation among contracts, AAR must provide on-time departures for scheduled airlift missions for no less than 85% of the missions scheduled by the Government within a month (unless the delay is not attributable to the contractor).

65.      Under some of its contracts, including the 2014 contract for Fixed Wing Air Support for airlift expeditionary services in Central Africa, aircraft must be certified as "Fully Mission Capable" for at least twenty four days per month with six scheduled days for maintenance per month.

66.      Failure to maintain "mission capable" aircraft at less than the specified schedule reliability rate will result in a prorating of payments under the contract and may result in a default and termination of the contract.

**D.      AAR Must Comply with DOD and FAA Regulations for Maintaining Airworthy Aircraft**

67.      Under 10 U.S.C. § 2640, a commercial air carrier may not contract with the Department of Defense for the charter air transportation of members of the armed forces unless: (1) the air carrier meets the safety standards established by the Secretary of Transportation under chapter 447 of title 49 (the Federal Aviation Act); and (2) the carrier undergoes a technical safety evaluation including on-site surveys, a performance evaluation of the carrier, and safety inspection of the aircraft.  10 U.S.C. §§ 2640(a)-(b).

16

68.     Additionally under the explicit terms of its DOD contracts, AAR must comply with: (1) the quality and safety criteria of 32 C.F.R. Part 861 (the DOD's quality and safety criteria); and (2) Federal Aviation Administration ("FAA") regulations.

69.     The DOD "as a customer of air transport and operational support services" expects air carriers to "employ programs and business practices that not only ensure good services but also enhance the safety, operational and maintenance standards established by [FAA] regulations." 32 C.F.R. § 861.4(a).

70.     Failure to adhere to safety and maintenance requirements, as mandated by DOD and FAA regulations, including tracking and timely inspection and replacement of life-limited parts, may result in suspension of any and all contracts between AAR and DOD and reduction in payments (or recoupment) under any specific contract.

1.     <u>Department of Defense Regulations Require that Contracting Air Carriers Provide Safe, Airworthy and Properly Maintained Aircraft</u>

a.     *AAR Must Meet DOD's Quality and Safety Program Requirements to be Eligible to do Business with DOD*

71.     The Secretary of Defense is charged with establishing safety requirements and criteria for evaluating civil air carriers and operators that provide air transportation to the DOD and with establishing a Commercial Airlift Review Board ("CARB") to review the activities of such air carriers.  10 U.S.C. § 2640(c); *see also* 32 C.F.R. § 861.2.

72.     Department of Defense Directive 4500.53, which describes the Department of Defense Commercial Air Transportation Quality and Safety Review Program, delegates the Secretary's authority to the Commander in Chief of the USTRANSCOM.

73.     Through this delegation of authority, the USTRANSCOM is responsible for coordinating all air, land, and sea transportation needs for the DOD, including by contracting with commercial transportation resources.

74.     The USTRANSCOM also is responsible for establishing safety regulations and criteria for evaluating air carriers providing air transport services to DOD.

75.     The USTRANSCOM is responsible for establishing the Civilian Airlift Review Board (CARB) and providing policy guidance and direction for its operation.  31 U.S.C. § 861.2.

76.     Under regulations prescribed by the USTRANSCOM, air carriers contracting with the DOD must "*meet and maintain*" the quality and safety criteria set forth at 32 C.F.R. § 861.4(e) "*to be eligible for DOD business*."  32 C.F.R. § 861.4(a)(emphasis added); *see also* 32 C.F.R. § 861.4(b)(1) ("The evaluation, quality and safety criteria and requirements set forth . . . apply to air carriers providing or seeking to provide air transportation services to DOD.").

77.     Air carriers must be approved by DOD prior to providing air carrier services and must remain in an approved status throughout the contract.  32 C.F.R. § 861.4(a).

78.     Once approved by DOD, air carriers are subject to recurring assessments by the CARB through the duration of the contract.  32 C.F.R. § 861.4(c).

79.     The CARB has authority to suspend air carriers or take other action against a carrier in response to quality or safety concerns about the air carrier.

> **b.     *DOD Quality and Safety Criteria for Air Carriers***

80.      DOD quality and safety regulations are intended to complement FAA regulations and "describe the enhanced level of services required by DOD."  32 C.F.R. § 861.4(e).

81.      "Safety is a paramount management concern."  32 C.F.R. § 861.4(e)(4). Accordingly, maintenance supervisors must ensure that "all personnel understand that in spite of

scheduling pressure, peer pressure, supervisory pressure, or other factors, the airplane must be airworthy prior to flight." *Id.* Further, "[n]on-conformance to established maintenance practices is not tolerated." *Id.*

82.     To implement its aircraft maintenance program, the DOD contractor must have a quality assurance program that "continuously analyzes the performance and effectiveness of maintenance activities and maintenance inspection programs." 32 C.F.R. § 861.4(e)(4)(ii).

83.     In addition, the DOD contractor must have "a process to ensure required aircraft inspections are completed and the results properly documented." 32 C.F.R. § 861.4(e)(4)(iii).

84.     The DOD contractor also must have a method to control maintenance activities and track aircraft status. 32 C.F.R. § 861.4(e)(4)(v). Qualified personnel must "monitor maintenance preplanning, ensure completion of maintenance activities, and track deferred discrepancies." *Id.* Deferred maintenance actions must be identified to supervisory personnel and corrected in accordance with the criteria provided by the manufacturer or the FAA. *Id.*

85.     The DOD contractor also must ensure that aircraft are "properly certified and maintained in a manner that ensures they are airworthy and safe." 32 C.F.R. § 861.4(e)(4)(vi).

86.     To ensure that aircraft are airworthy and safe, the DOD contractor's maintenance program must "include[] the use of manufacturer's and [FAA] information, as well as company policies and procedures." *Id.* Airworthiness directives must be complied with in the prescribed time frame and service bulletins must be evaluated for action. *Id.*

87.     Management must have "visibility on the effectiveness of the maintenance program" and attention must be given to "initial component and older aircraft inspection intervals and to deferred maintenance actions." *Id.*

88.     Maintenance actions must be well documented and "provide a complete record of maintenance accomplished and, for repetitive actions, maintenance required."  32 C.F.R. § 861.4(e)(4)(vii).

89.     Finally, company and manufacturer maintenance manuals must be "current, available, clear, complete, and *adhered to by maintenance personnel*."  32 C.F.R. § 861.4(e)(4)(x) (emphasis added).

        2.     <u>FAA Regulations Require that Air Carriers Operate Safe, Airworthy and Properly Maintained Aircraft</u>

90.     In addition to the DOD regulations set forth above, pursuant to 10 U.S.C. § 2640(a) and the terms of its DOD contracts, AAR must comply with all FAA safety standards, including by operating in accordance with the conditions of its airworthiness certificate and the terms of its FAA-approved operations specifications.

        *a.     AAR Must Operate Under the Terms of its Airworthiness Certificate*

91.     Under the Federal Aviation Act, no one may operate a civil aircraft in air commerce without an airworthiness certificate.  49 U.S.C. § 44711(a)(1).  Further, an air carrier may not operate an aircraft without an air carrier operating certificate or in violation of the terms of such a certificate.  49 U.S.C. § 44711(a)(4).

92.     The FAA will issue an air carrier operating certificate to an applicant only upon a finding that the person is adequately equipped to "operate safely under this part" and according to "regulations and standards prescribed under this part."  49 U.S.C. § 44705.

93.     Specifically, as relevant here, to maintain an operating certificate, air carriers must perform all inspections, repairs, and maintenance "as required by this part or regulations

prescribed or orders issued by the Administrator of the Federal Aviation Administration under this part."  49 U.S.C. § 44713(a).

94.    Once granted, standard airworthiness certificates are valid only so long as the aircraft's maintenance, preventive maintenance, and alterations are performed in accordance with Part 43 of the Federal Aviation Regulations.

95.    Defendant AAR Airlift is an air carrier operating under a Part 135 certificate. Part 135 is a section of the FAA regulations governing air carriers providing commuter and "on-demand" airlift services.

96.    Part 135 certificate holders may not operate an aircraft unless it "is in an airworthy condition and meets the applicable airworthiness requirements of this chapter."  14 C.F.R. § 135.25.

97.    Each air carrier is primarily responsible for the airworthiness of its aircraft, including airframes, propellers, rotors, appliances and parts, and must have its aircraft maintained in accordance with FAA regulations. 14 C.F.R. § 135.413(a).

98.    Airworthiness requirements provide that each air carrier must have an inspection and maintenance program that ensures "maintenance is performed under [the carrier's] manual and that "each aircraft released to services is airworthy and has been properly maintained for operation under this part."  14 C.F.R. § 135.425; *see also* 14 C.F.R. § 135.21; 14 C.F.R. § 135.427 (directing mandatory requirements for air carrier maintenance manual).

99.    FAA Advisory Circular 120-16 F "Air Carrier Maintenance Programs" provides additional guidance on air carrier maintenance programs and explains that all maintenance and alterations must be performed in accordance with the air carrier's maintenance manual.  *Id.*

100.    Each air carrier must maintain a recordkeeping system that tracks information relevant to maintenance items and maintenance schedules, including, but not limited to: (1) the total time in service of the airframe, engine, propeller, and rotor; (2) the current status of life-limited parts of each airframe, engine, propeller, rotor, and appliance; (3) the identification of the current inspection status of the aircraft; (4) the current status of applicable airworthiness directives, including the date and time of compliance, and, if the airworthiness directive involves recurring action, the time and date when the next action is required; and (5) a list of current major alterations and repairs to each airframe, engine, propeller, rotor, and appliance.  14 C.F.R. § 135.439.

101.    An air carrier may return an aircraft to service after maintenance or alteration provided in the maintenance manual.  Major repairs or alterations require submission of technical data to FAA and FAA approval.  14 C.F.R. § 135.437(b).

102.    FAA guidance further directs that, to meet the FAA regulations, each air carrier's maintenance program should have a system of continuing surveillance, investigation, data collection, analysis, corrective action, and corrective action follow-up that ensures all parts of the maintenance program are effective and being performed in accordance with the air carrier's maintenance manual.

b.    *Air Carriers Also Must Maintain Aircraft in Conformance with Aircraft Manufacturers' Instructions for Continued Airworthiness*

103.    Maintaining aircraft in airworthy condition for purposes of Part 135 also requires compliance with FAR Part 43, which governs maintenance, rebuilding, and alteration of aircraft.  14 C.F.R. § 135.413.

104.    Part 43 of the Federal Aviation Regulations contains specific and extensive requirements for the maintenance and repair of all aircraft operating under a U.S. airworthiness certificate.  14 C.F.R. § 43.1(a)(1).

105.    Under 14 C.F.R. § 43.13, all maintenance must be performed in accordance with the aircraft manufacturer's maintenance manual or "Instructions for Continued Airworthiness." *See* 14 C.F.R. § 43.13(a) ("Each person performing maintenance, alteration, or preventive maintenance on an aircraft, engine, propeller, or appliance shall use the methods, techniques, and practices prescribed in the current manufacturer's maintenance manual or Instructions for Continued Airworthiness prepared by its manufacturer, or other methods, techniques, and practices acceptable to the Administrator, except as noted in 43.16.").

106.    Manufacturer manuals for aircraft and aircraft components must contain "Instructions for Continued Airworthiness" with an "Airworthiness Limitations" section.  *See* FAA Order 8110.54A "Instructions for Continued Airworthiness Responsibilities, Requirements and Contents" Chapter 4, section 1.a ("For an aircraft, aircraft engine, or propeller, there must be a separate and distinguishable ICA section, called Airworthiness Limitations Section.").

107.    The Airworthiness Limitations section of the manufacturer manual must include: (1) FAA-approved mandatory replacement times for each aircraft component; (2) FAA-approved mandatory inspection times for each aircraft component; (3) inspection procedures; and (4) critical design configuration control limitations (CDCCL) for FAA-approved aircraft components.

108.    An air carrier must maintain its aircraft in conformance with the Airworthiness Limitations section of a manufacturer's manual, including requirements for inspection and replacement of aircraft components or parts, to maintain the aircraft in an airworthy condition.

109.    Part 43 further requires that records of maintenance or alteration on aircrafts be kept.  *See* 14 C.F.R. § 43.9(b).

110.    Finally, FAR Part 43 specifically prohibits the falsification of such maintenance records.  *See* 14 C.F.R. § 43.12 ("No person may make or cause to be made: (1) Any fraudulently or intentionally false entry in any record or report that is required to be made, kept, or used to show compliance with any requirement under this part; (2) Any reproduction, for fraudulent purpose, of any record or report under this part; or (3) Any alteration, for fraudulent purpose, of any record or report under this part.").  Violation of this provision may result in suspension or revocation of the offending party's operating certificate.

### 3.    Additional Provisions in AAR's Contracts with USTRANSCOM and Military Sealift Command Require That Airworthiness Be Maintained

111.    In addition to incorporating by reference the foregoing DOD and FAA regulations, each AAR contract also incorporates in full the requirements of TRANSFARS clause 5552.247-9000 (a provision under USTRANSCOM's acquisition regulations).

112.    TRANSFAR clause 5552.247-9000, "Air Safety," provides that "[c]ontractor is obligated to comply with generally accepted standards of airmanship, training, and maintenance practices and procedures.  Contractor must also satisfy Department of Defense (DOD) quality and safety requirements as described in 32 C.F.R. § 861.4.  In addition, the contractor shall comply with all provisions of applicable statutes, tenders of service, and contract terms as such may affect flight safety, as well as with all applicable Federal Aviation Administration (FAA) Regulations, Airworthiness Directives, Orders, rules, and standards promulgated under the Federal Aviation Act of 1958, as amended."

113.    Failure to meet the obligations of the TRANSFAR regulations may result in the contractor's suspension or placement in temporary nonuse.  *Id.*

24

114.    AAR's contracts with Military Sealift Command contain similar requirements. The contractor must be a "certified commercial operator or Air Carrier," "adhere to all applicable provisions of the Federal Aviation Regulations" including Part 135, "possess all applicable FAA certificates," remain "under FAA regulatory and safety oversight during the period of the contract when performing the government mission," "conduct all maintenance . . . in accordance with the FAR," "remain contractually bound to adhere to all applicable Federal Statutes, Regulations, Rulings, and Directives applicable to non-'public aircraft' even if the aircraft are deemed 'public' by the Department of Transportation," and "shall adhere to DOD Commercial Aircraft Requirements under 32 C.F.R. § 861 and must meet DOD Commercial Aircraft Additional Standards for Part 135 operations."

115.    The AAR contracts also require that, "[a]ll time-change components, including engines, shall be replaced upon reaching the factory recommended time, or FAA approved extension, if applicable."

116.    Further, AAR must warrant that, "all aircraft, avionics and associated equipment shall be maintained in accordance with the specifications of this contract, the manufacturer's specifications, and all Federal Aviation Regulations (as if it were a civil aircraft).  In instances where this contract conflicts with the manufacturer's specifications and/or Federal Aviation Regulations, the manufacturer's specifications and the Federal Aviation Regulations take precedence."  Despite the contract's inclusion of a provision for seeking a waiver of certain parts of the contract, the contracts warn, "[i]t is not anticipated that any waivers to maintenance requirements will be granted."

## V.     ALLEGATIONS

### A.     AAR Has Knowingly Presented False or Fraudulent Claims for Expeditionary Airlift Services

117.     Since the Spring of 2010, when AAR Corp. purchased Presidential Airways from Blackwater, AAR has presented to the United States claims for airlift expeditionary services and been reimbursed millions of dollars.

118.     Those claims were and are knowingly false or fraudulent because AAR sought and continues to seek reimbursement for services performed while in violation of material conditions of reimbursement under its multiple DOD contracts.

119.     Specifically, AAR has knowingly failed to maintain its aircraft as required by DOD contracts, DOD quality and safety regulations, FAA regulations and the terms of AAR's air carrier operating certificate, and TRANSFAR regulations.

120.     AAR's failure to maintain its aircraft includes failure to track and replace life-limited parts as required by manufacturer manuals, alteration of aircraft to install unapproved parts, and failure to follow Airworthiness Directives issued by the FAA.

121.     AAR has also knowingly made false statements material to these false claims by repeated representations to DOD officials that its inspection and maintenance program met DOD quality and safety standards for air operators and that AAR was eligible for DOD business.

122.     AAR has also knowingly falsely represented to DOD officials that aircraft are "mission ready" when they are not.  Representation of the aircraft as mission-ready allowed AAR to avoid prorated payments under its DOD contracts, obtain payment for claims for airlift services and to avoid default under its DOD contracts for failure to meet schedule-reliability rates.

123.    AAR has concealed from DOD and the FAA the magnitude and scope of its maintenance and maintenance control deficiencies in order to continue receiving payment under DOD contracts and to avoid any impact on its bids on new, highly-competitive, DOD contracts for airlift services.

        1.    <u>AAR Discovered Multiple, Significant Safety and Maintenance Issues in the Presidential Fleet it Had Acquired But Failed to Address Them</u>

124.    When AAR purchased Presidential Airways in April of 2010, it acquired a fleet of around 45 fixed-wing and rotor-wing aircraft operating on Presidential's FAA certificate and it assumed the DOD contracts from Presidential.  AAR had not previously operated airlift services for DOD.

125.    Presidential Air, like its parent company Blackwater, had a notorious history related to aviation services in Afghanistan.  In 2004, in a widely-reported incident, Presidential crashed one of its Casa 212s into a mountain shortly after take-off from Bagram Air Base in Afghanistan.  The crash killed all passengers -- three Air Force members and three civilians.  The National Transportation Safety Board (NTSB)'s subsequent investigation of the crash found numerous deficiencies in Presidential Airway's Part 135 operations in Afghanistan.  To address these concerns, NTSB, among other things, issued Safety Recommendations A-06-77 and -78 to the FAA and DOD for coordination of oversight of aviation contractor operations in Afghanistan.

126.    After AAR's purchase of Presidential Air, most aircraft remained in the theaters of operation where they were deployed.  The few aircraft that were not in active service were moved from Presidential's facility in North Carolina to AAR's facility in Florida.

127.     As part of its purchase of Presidential, AAR transferred Presidential's maintenance and recordkeeping program, WinAir, and hired Presidential's maintenance and recordkeeping staff.

128.     Jeff Schloesser, AAR Airlift's CEO at the time, and Andy Milani, AAR Airlift's COO at the time, coordinated the transition.

129.     Initially, to ensure that all aircraft transferred from Presidential or purchased from other carriers were up-to-date on all required inspections and maintenance and FAA regulations, AAR created a Conformity Department within the Technical Services Division under the management of Robert Roswell, Manager of Conformity.  Many members of the Conformity Department, including Relator and Roswell, were external hires.

130.     In January 2011, AAR's management directed that, in addition to conforming new aircraft, "internal conformities" would be performed on the aircraft transferred from Presidential.  The Conformity Department commenced its reviews by gathering all records of inspection and maintenance for the selected aircraft.

131.     Internal conformities were performed under Relator's supervision on 3 Sikorsky S-61 aircraft and one Bell 214ST (craft numbers N725JH, N61NH, N116AZ, and N28014).

132.     These internal conformities disclosed literally hundreds of safety and maintenance issues that revealed that the aircraft had not been maintained by Presidential in accordance with manufacturer manuals for replacement of life-limited parts and FAA Airworthiness Directives.

133.     For example, each aircraft must be maintained under an FAA approved "Continuous Airworthiness Maintenance Program" ("CAMP").  The CAMP should be updated regularly to incorporate airworthiness limitations from the manufacturer's manual.

134.     The Conformity Department found that Presidential's CAMP for the S-61 helicopters was incomplete and woefully out of date.  For example, the S-61 manufacturer maintenance program requires a "debonding check" to be conducted on the helicopter's tail rotor blades every 12 months.  This requires the maintenance crew to ensure that the blades on the tail rotor are not in danger of falling apart (a particular concern in sandy or salt-water environments). Relator's team discovered that there was no debonding check in the CAMP.

135.     When Relator inquired about this he was shocked to learn that management of the maintenance department had no idea such a check was necessary, let alone whether it had been conducted.

136.     The problems with the S-61 CAMPs were only the tip of the iceberg.  There were parts on the S-61s that could not be confirmed as valid for that aircraft.  There were life-limited parts that were not being tracked such that there was no way to ensure that they would be inspected and replaced as required.

137.     In addition, across the fleet inherited from Presidential, Relator, Roswell, and the Conformity Department found that the information in WinAir was extremely incomplete.  Thus, even if all of the information in WinAir was migrated to TRAX, AAR's new record-keeping, maintenance, and inventory control system, it would still not be a functional system because hundreds of key data elements were blank, incorrect, or unsupported.

138.     Maintenance also had not been properly documented.  There was no, or inadequate, evidence that life-limited parts had been tracked or replaced as required by manufacturer manuals or FAA Airworthiness Directives.

139.   The internal conformity reports were sent to AAR Airlift management.  But rather than directing that these planes be grounded until brought up to DOD and FAA standards, no maintenance work was ordered.

140.   Instead, Rob Roswell, then manager of AAR Airlift's Conformity Department, announced that AAR management had directed that the internal conformities be halted.  The Conformity Department was not permitted to complete work on a fourth internal conformity.

141.   At the same time, in late 2011, President and CEO of AAR Airlift, Randy Martinez, organized a meeting with the Conformity Department.  Present at that meeting was Manager of Conformity Rob Roswell, Relator, and Conformity Specialists Drew Anderson, Ben Becker, Michael Bach, George Fowler, and William Youngblood.

142.   Martinez told them he knew there were "skeletons in the closet" at Presidential and that he had had a so-called "come to Jesus" meeting with former Presidential managers and given them their "one and only chance" to disclose the scope of the maintenance issues with him.  Martinez told them he had had this discussion with Frank Reuter, Director of Maintenance, Jeff Baumgartner, Manager of Fixed Wing Maintenance, and Nathan Hill, Manager of Rotor Wing Maintenance.

2.   AAR Conceals Airworthiness Issues from DOD

143.   At the same time AAR was learning about the problems with the Presidential aircraft, it was also struggling to meet DOD contractual performance requirements.  Under the inherited DOD contracts, AAR was required to meet schedule reliability rates for on-time departures to receive full payment.  Failure to maintain schedule reliability rates could result in pro-rating of payments under the contracts and risk default and termination of the contract.

144.    In order to ensure it met schedule reliability requirements above 80%, AAR did not disclose to DOD the extensive problems it was having with maintenance of the aircraft transferred from Presidential.  AAR managers, including Larry Montford and Anthony Leal, represented to DOD officials, on an ongoing basis, that many aircraft were "mission-ready" when, in fact, they required maintenance or for which it could not be demonstrated that life-limited parts had been tracked or replaced as required.

145.    AAR managers knew that if AAR disclosed the maintenance problems, or failure to track life-limited parts, that DOD could have exercised its right to cancel contracts or reduce payments under its contracts.

146.    Rather than taking corrective action to deal with the maintenance failures reported repeatedly to management by Relator and others, AAR chose to conceal these maintenance failures.

147.    AAR's refusal to take corrective action may have had deadly consequences.  In January 2012, one of AAR's Bell 214s, crashed in the Helmund Province of Afghanistan, killing three AAR employees. Relator learned that mechanics in Afghanistan had told AAR personnel that they understood that the crash was likely attributable to maintenance issues.

148.    Relator discovered and reported to AAR managers numerous significant maintenance issues that violated AARs obligations under its contracts and applicable regulations while he was in the Conformity Department.

149.    In January 2013, Vice President of Maintenance, Larry Montford, asked members of the Conformity Department, including Relator, to tell him every concern they had about maintenance of the aircraft.  VP Montford told members of the Conformity Department that he needed to know because "these are the things that kept him up at night."

31

150.    Relator responded to VP Montford's request by sending him reports from WinAir showing hundreds of potentially serious maintenance issues that had not been tracked by Presidential and were then not being properly tracked by AAR for forty-six aircraft (fixed wing and rotary wing).

151.    Nevertheless, AAR disbanded the Conformity Department in 2013, and Relator was moved to the TRAX Department.  Relator continued to find evidence that multiple, significant maintenance issues plagued the aircraft transferred from Presidential to AAR. Relator continued to report these issues to AAR managers.

152.    Over the course of a year and a half, Relator engaged in protected activity by repeatedly attempting to get AAR managers to respond to his concerns about the multiple maintenance issues.  He made many reports to AAR managers including, but not limited to, the following reports:

- On February 26, 2013 and March 20, 2014, Relator e-mailed safety and compliance reports to Larry Montford (AAR Airlift, Vice President of Aircraft Maintenance);

- On April 1, 2013, Relator e-mailed the safety and compliance reports to Randy Martinez (President and CEO of AAR Airlift and an Officer of AAR Corp.) and Kyle McGillivray (AAR Airlift, Vice President of Human Resources), stating that he was elevating his reports to VP Montford pursuant to AAR Airlift's Quality and Safety Policy and AAR's Non-Punitive Safety Event Reporting Policy;

- On April 5, 2013, Relator attended an in-person meeting with VP Montford where VP Montford stated that AAR was well aware of the discrepancies with the

32

maintenance tracking program and that the safety and compliance issues were being addressed;

- From May 8, 2013 through May 20, 2013, Relator sent a series of e-mails to AAR senior aircraft records management, including Donna Baumgartner (AAR Airlift, Lead Technical Records Specialist); Laura Schwartze (AAR Airlift, Manager of Technical Records); and William Szekely (AAR Airlift, Aircraft Avionics Manager), regarding on-going safety and compliance issues with Casa 212s;

- On June 28, 2013, Relator filed an online complaint with Ethicspoint, AAR's online ethics reporting system, stating that he felt he had been retaliated against for reporting safety and compliance concerns;

- On July 3, 2013, July 15, 2013, and August 6, 2013, Relator supplemented his Ethicspoint Hotline Complaint, indicating that he had not received any response from AAR regarding his safety and compliance reports and believed he was still being retaliated against;

- During July and August 2013, Relator sent multiple e-mails to AAR Manager Ryan Knight regarding on-going safety and compliance issues with Casa aircraft;

- On August 7, 2013, Relator sent an e-mail to Kyle McGillivray (AAR VP Human Resources) and Tim Skelly (AAR Corp. Chief Human Resources Officer) regarding AAR's failure to respond substantively to Relator's safety and compliance reports.  In the e-mail Relator stated that, because AAR had failed to appropriately address the concerns, he intended to take his concerns outside of the company;

- On September 26, 2013, and October 8, 2013, Relator sent reports to Candace Goodpaster (AAR Corp. VP Human Resources) regarding specific examples of ongoing aircraft safety and compliance issues;

- On October 15, 2013, Relator attended an in-person meeting with Art Smith (AAR Corp. Vice President and Chief Quality Officer) and Tom Howell (AAR Airlift, Vice President of Quality and Safety) regarding ongoing safety and compliance issues with aircraft including reports about the S-61s and Casa 212s;

- On October 23, 2013, Relator sent a comprehensive report to Ryan Knight (AAR Airlift, Manager of Conformity Department) and Anthony Leal (AAR Airlift, Technical Services Director) regarding serious aircraft and safety issues on the S92 helicopters;

- On October 23, 2013, Relator sent an email to Anthony Leal (AAR Airlift, Technical Services Director) regarding S-61 landing gear safety and compliance issues;

- On November 5, 2013, Relator sent an email to Anthony Leal, Ryan Knight, and Jeff Baumgartner regarding the compliance issues associated with the Casa aircraft;

- On January 27, 2014, Relator sent a report to AAR manager Ryan Knight concerning safety and compliance issues with the Bell helicopter B412 components;

- On April 7, 2014, Relator sent a report to AAR managers about his safety and compliance concerns regarding life-limited pressure hoses for S61 helicopters;

- On May 21, 2014, Relator sent a report to AAR managers concerning deactivation of the emergency release system on Puma helicopter model SA330J and the immediate flight safety risk from this unapproved modification to the aircraft;

- On June 19, 2014, Relator attended an in-person meeting with Tom Howell (AAR Airlift, Vice President of Quality and Safety) and AAR Manager Ryan Knight regarding reporting of safety and compliance issues through AAR Airlift's APRISE system;

- On June 20, 2014, Relator submitted a report through APRISE regarding Puma helicopter cargo hook emergency release system deactivation and non-compliance with tracking of life-limited Puma crew belts and harnesses;

- On June 23, 2014, Relator sent a report to AAR Manager Ryan Knight concerning several hundred safety and maintenance issues with Puma helicopters.

- As discussed in paragraphs 157 through 168 below, Relator subsequently reported his safety and compliance concerns regarding AAR to both the Federal Aviation Administration and the Occupational Safety and Health Administration.

153.    After his initial safety reports, AAR initially promised Relator that it would take corrective action in response to his concerns.  AAR, however, took no such corrective action.

154.    When there was no such corrective action and Relator continued to object, his concerns were ignored or dismissed.

155.    At times AAR management took steps to conceal issues identified by Relator through modification of the electronic systems for tracking maintenance.

156.     Eventually, AAR managers restricted Relator from accessing the WinAir or TRAX programs and, for a period, told Relator that he was not permitted to raise complaints with anyone other than his direct supervisor (including through AAR's complaint tip-line).

157.     Relator also reported the safety and maintenance issues he had identified to the FAA.  He submitted an initial whistleblower complaint to the Washington, D.C. FAA Office on August 9, 2013.

158.     Relator also reported the safety and maintenance issues to the FAA Flight Standards District Office in Orlando, Florida beginning in December 2013.

159.     In August 2014, Relator received a letter from the FAA Office of Audit and Evaluation stating that the FAA's Flight Standards Service had completed its investigation of his first whistleblower complaint and had "substantiated that a violation of an order, regulation, or standard of the FAA related to air carrier safety occurred" and stating that the FAA was taking appropriate enforcement and/or corrective action.

160.     In March 2014 and May 2014, Relator was informed by the Principal Maintenance Inspector for the FAA District Office in Orlando, Florida that they had investigated his complaint and that AAR was operating its DeHavilland DCH-8 aircraft under an out-of-date inspection program and that AAR's manual "did not meet the requirements of 14 C.F.R. Part 135."  Relator also was informed by the Principal Maintenance Inspector for the FAA District Office in Orlando, Florida that they had found Relator's complaint about the Casa-C-212 elevator bolts, discussed below, to be valid and that FAA "was in the process of taking action against AAR."

161.    Relator also filed charges with the Occupational Safety and Health Administration (OSHA) to report the retaliation he faced as a result of the protected conduct referenced above in paragraph 152.

162.    On August 26, 2013, Relator filed an initial charge with OSHA based on AAR's retaliatory conduct.

163.    On October 14, 2013, Relator filed a charge with OSHA based on AAR's potential violations of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1541A (SOX).

164.    On December 8, 2013, Relator filed a rebuttal to AAR's response to his initial charge with OSHA.

165.    On January 21, 2014, Relator supplemented his December 8, 2013 OSHA submission with additional retaliatory information.

166.    On March 12, 2014, Relator met with the OSHA investigator to discuss his retaliation concerns.

167.    On June 12, 2014, Relator supplemented his December 8, 2013 OSHA submission with additional retaliatory information.

168.    On June 29, 2014, Relator supplemented his December 8, 2013 OSHA submission with additional retaliatory information.

3.    Examples of Safety and Maintenance Issues

169.    AAR's systemic failure to perform required inspections and maintenance of aircraft inherited from Presidential or acquired thereafter, including tracking and replacement of life-limited parts, violated the requirements for maintaining its eligibility to do business with DOD, DOD and FAA regulations, and the express conditions of payment under its multiple contracts.

37

170.    AAR's failure to properly maintain its aircraft affects every type of plane and helicopter in its fleet providing airlift services under DOD contracts.

171.    Examples of the significant maintenance issues Relator discovered with three of the major aircraft inherited from Presidential, the Casa C-212's, Sikorsky S-61's, and Puma 330's, are set forth below.  These examples are not exhaustive of the significant maintenance issues Relator identified.

172.    As a result of these systemic maintenance failures, many of the aircraft in the fleet were not airworthy as defined by FAA regulations.

173.    AAR's failure to maintain the aircraft in conformance with DOD contracts and DOD and FAA regulations makes it ineligible for contracting with DOD and violates express conditions of payment under its DOD contracts.

a.    *The Casa C-212s*

174.    The Casa C-212 ("C-212") is a turbo-prop powered, short-take-off-and-landing, medium transport aircraft that seats up to 26 passengers and carries up to 5,952 lbs. of cargo. AAR Airlift has eleven C-212's in its fleet.  Nine of these were inherited from Presidential and two were purchased new by AAR (craft #602AR and 603AR) after the Presidential purchase. Relator was involved with conforming two C-212s purchased by AAR.

175.    Through this process, and additional work in the TRAX Department, Relator discovered that the Casa C-212 fleet had not been inspected and maintained as required by DOD contracts and by DOD and FAA regulations.

38

i.      *Casa C-212: Failure to Inspect and Replace Elevator Flight Control Bolts*

176.    In March of 2007, the manufacturer of the C-212, Airbus Military, issued a "temporary revision" to chapter 5 of its maintenance manual (the "airworthiness limitations" section of the manufacturer's manual) to address service required for the aircraft's elevator bolts, due to the discovery of cracks by various operators.

177.    The elevator bolts connect the  control columns together through a cross tube that, in turn, controls the aircraft elevator through the pilot's input of forward and aft movements. This then controls the aircraft pitch up and pitch down movements.  Failure of the bolts could directly result in the loss of pitch control of the aircraft.

178.    The manual revision called for the bolts to be checked and replaced with stronger bolts.  Once the parts were replaced, the parts must continue to be replaced every four years.

179.    "Temporary revisions" to the manufacturer's manual are issued for services that must be performed to ensure the airworthiness of the aircraft.

180.    The manufacturer intended that the revision be incorporated quickly into the plane's required maintenance program.  AAR is required, as a condition of reimbursement under its DOD contracts, to follow and implement manufacturer requirements for inspection and replacement of life-limited parts set forth in the "airworthiness limitations" of the manufacturer manual.

181.    AAR Airlift purchased two C-212's for its fleet around May 2012.  While conforming one of these, Relator found that AAR's Continued Airworthiness Maintenance Program ("CAMP") for the Casa C-212s, inherited from Presidential, had no reference to the elevator bolt inspection or replacement required by the manufacturer's manual revision.  As a result, AAR was not tracking whether the bolts had been replaced (as would have been required

39

for every C-212 by 2012) and there was no record that the bolts had ever been inspected or replaced by Presidential.

182.    Disturbed by this, Relator reached out to the C-212 manufacturer to ensure his understanding of the maintenance manual was correct.  He was assured through several e-mails that due to the age of AAR's aircraft, they should all have had their bolts replaced and the new bolts should continue to be replaced every four years.

183.    Relator incorporated the bolt inspection and replacement requirement into the revised CAMP for the newly-acquired C-212s but was concerned about the other nine C-212s in the fleet for which there was no record that the elevator bolts had been replaced.  Relator raised this concern with his supervisors and asked that the regular inspection/replacement be added to the maintenance plan for those aircraft.

184.    Instead of scheduling the remaining C-212s in the fleet for the part replacement, AAR's management decided to perform a check of the bolts every 100 hours of flight time and to replace them the next time the planes were scheduled for a "4Y" check (a "heavy" check performed every four years).

185.    AAR's decision meant that the elevator bolts would not be replaced with the proper parts for *several more years after they should have been replaced as required by the issuance of the manufacturer's directive.*

186.    Rather than scheduling the C-212s for the part replacement, AAR managers fabricated a date (October 16, 2012) at which the planes supposedly had been brought into compliance with the revision to the maintenance manual and entered that false date into the maintenance records system such that the next required replacement work would conveniently line up with the plane's next 4Y check.

187.    When Relator learned of this he objected strenuously to, among others, Jeff Baumgartner (Fixed Wing Maintenance Manager), Tony Leal (Director of Technical Services), Frank Reuter (Director of Maintenance), and Ryan Knight (Manager of Conformity Department).  Relator's objection was acknowledged but he was told to stand down.

188.    AAR Airlift personnel also altered the maintenance records for the bolts on the C-212's that Relator and his team had conformed.

189.    When Relator conformed craft #N603AR (an aircraft not acquired from Presidential) he programmed the maintenance tracking software (WinAir at the time) to schedule the next replacement for April 14, 2014, exactly 4 years after the previous operator had replaced the bolts.  This entry was a "hard time" or "HT" inspection and maintenance date meaning that the schedule could not be altered to extend the maintenance interval.

190.    Despite the requirement that the bolt be replaced at a precise interval, AAR Airlift wanted to perform the bolt replacement on the N603AR at the plane's 4Y check which would not be until December 19, 2014 (more than 8 months after the bolt replacement would be due).  AAR managers directed that the tracking date be altered to show a due date of 12/19/2014.  This was done at the order of Ryan Knight, Tony Leal, Gary Clemmer (Director of Quality), and John Gill (who had replaced Frank Reuter as Director of Maintenance).

191.    When Relator's internal reports of this noncompliance and alteration of maintenance records went unheeded, he reported the issue to the FAA in 2014.

192.    Soon thereafter, an FAA agent informed Relator that they had confirmed the violations he had reported and directed AAR to replace the elevator bolts.

ii.     *Casa C-212: Failure to Perform Required Hydraulic Fluid Sampling*

193.    The C-212 manufacturer's manual has required, since 1993, that hydraulic fluid sampling be performed every 3,600 hours of flight.  A hydraulic system is used to assist with flight control.  It is critical to flight safety that hydraulic fluid remains free from contamination.  Further, contamination may indicate impending system failure.

194.    AAR is required, as a condition of reimbursement under its DOD contracts, to follow and implement manufacturer requirements for inspection and maintenance set forth in the "airworthiness limitations" of the manufacturer manual.

195.    When Relator was conforming C-212 aircraft N602AR, he realized that AAR's CAMP for this aircraft, inherited from Presidential, had no provision for hydraulic fluid sampling.  Further, a review of the maintenance tracking system showed that there was no indication that such sampling had ever been done.

196.    Although the C-212 CAMP was revised to include this sampling requirement and the Conformity Department initiated a Technical Services work order request, asking that a "maintenance control number" be added for each C-212 to begin monitoring and performing hydraulic fluid sampling every 3,600 hours, no sampling was performed and tracking was never activated.  When Relator checked the status of this issue again in September 2013, almost a year after the issue was identified, the records for nine of the eleven C-212s in the fleet still showed no evidence that sample testing of hydraulic fluid had been performed, was forthcoming, or that the issue was being tracked to trigger the testing to be performed at a later date.

197.    When Relator realized that key quality and maintenance personnel within AAR Airlift were well-aware of this issue but had failed to take corrective action, and this important maintenance task continued to be ignored, he reported this issue to the FAA.

42

> iii.    *Casa C-212 N602AR: Improper Installation of Steering Pressure Limiting Valve*

198.    Manufacturer requirements for C-212s require the steering pressure limiting valve to be overhauled every 3,600 hours of flight time.

199.    The steering pressure limiting valve moderates the hydraulic pressure in the nose landing gear steering actuator.  Failure of this part would significantly reduce control of the aircraft on the ground, particularly during takeoff and landing.

200.    AAR is required, as a condition of reimbursement under its DOD contracts, to follow and implement manufacturer requirements for inspection and replacement of life-limited parts set forth in the "airworthiness limitations" of the manufacturer manual.  AAR is also required under DOD and FAA regulations to provide a complete, documented record of maintenance performed and to track dates for future required maintenance.

201.    While conforming C-212 aircraft #N602AR, Relator found that a pressure limiting valve, part number CA23500-5 SN SC146, had been installed on the aircraft in November 2012.  However, there was no documentation demonstrating when the part had last been overhauled (and thus how long was remaining before overhaul was again required).

202.    Although an SKU sticker generated by the Parts Department identifying the part for inventory control purposes noted a time since overhaul of 631.1 hours, the SKU was unsigned with no way to track who had performed the inspection or the source of the data.

203.    On November 28, 2012, Relator sent an email to several of his superiors, including Frank Reuter (Director of Maintenance), Tony Leal (Director of Technical Services), Ryan Knight (Manager of Conformity), and John Gill (Director of Quality Control), alerting them to the failure to track overhaul of the steering pressure valve.  He received no response.  A week later, Relator emailed these parties again because the plane was scheduled to head overseas

for use.  Director of Maintenance Frank Reuter told Relator that the unverified time-since-overhaul value of 631.1 hours was to be adopted and the plane would be released for service.

204.    Relator reported this issue to the FAA in September 2013.

### iv.    Casa C-212s: Failure to Track and Overhaul Engine Mounts

205.    Engine mounts, or "engine isolator mounts," are part of the system attaching the C-212 engines to the airframe.  There are eight mounts per C-212: four mounts per engine (top, inboard, outboard, and aft) and two engines per C-212.  The mounts have hardened rubber pads that protect the airframe from engine vibrations.  These pads wear over time and this wear can exacerbate engine vibrations.  Further, failure of a mount can result in catastrophic damage, including separation of the engine from the airplane.  For this reason, engine mounts, per Casa manufacturer requirements, must be overhauled every 7,000 hours.

206.    Relator found that AAR was failing to properly track engine mounts on several of the C-212 aircraft in violation of its DOD contracts and FAA and DOD regulations.

207.    Relator found that some mounts were not being tracked at all.  For example, during a review of aircraft 605AR, Relator found that there was no tracking for the inboard mount on the left engine.  This meant that the part would never be triggered for necessary overhaul.  He reported this to Larry Montford, VP of Maintenance, in February 2013.  He was assured by management that the issue would be addressed, but found months later during a parts audit that the part continued to go untracked.

197.    Relator also discovered that AAR's maintenance recordkeeping system inherited from Presidential, WinAir, was often not tracking the engine mount part on the plane on which it was installed or had been designated as unserviceable.

198.    The company was well aware of this issue, which had resulted in a failure to overhaul these parts at the manufacturer-mandated time limits.  For example, around November 2011, three engine mounts (part numbers NAT030, NAT031, and NAT017) were due for overhaul.  The electronic recordkeeping system showed that they had been installed on aircraft 606AR.  A maintenance work order was issued for these parts to be overhauled.  When AAR maintenance crew went to do the required work, they found that these parts were not in fact installed on this aircraft.  The parts verified on physical inspection as present were shown in the WinAir system to have been installed on 607AR.  Accordingly, the 606AR was released back to service and the parts were not overhauled.

199.    Relator found and reported other similar issues with the failure to track and replace engine mounts.  For example, he found that several C-212s showed part numbers being tracked in mount positions that made no sense because they were not physically possible.  Relator reported this issue to his supervisor, Ryan Knight, in August 2013.  In addition, Relator found that the part electronically installed in the aft mount position on the right engine on aircraft 6369C had been installed in 2008 "on condition," meaning that the overhaul requirement had been overridden and no tracking was being conducted.

*v.    Failure to Track and Maintain Fire Extinguishers*

208.    During the conformities and through later projects, Relator found additional problems affecting the fleet.  For example, Relator found that, just as Presidential had done, AAR was failing to properly track, maintain, and replace fire extinguishers across the fleet.  This was a particular problem for the Casa C-212, Sikorsky S-61, and Puma 330 fleets.

209.    Because of the serious consequences of an in-flight fire, all aircraft are required to have several fire extinguishers on-board and in specific locations.  Pursuant to its "General

Maintenance Manual" ("GMM"), AAR must track and service these fire extinguishers in accordance with the manufacturer's maintenance requirements.  Manufacturer H3R's model C352 (used commonly across AAR's fleet) must be inspected monthly, tested annually, recharged every 6 years (meaning that the bottle is emptied and certain parts replaced), and subject to a hydrostatic overhaul every 12 years (which ensures the continued integrity of the bottle).

210.    Relator found that for some extinguisher locations on various aircraft, there was no tracking at all.  Accordingly, AAR could not even confirm that a fire extinguisher was in place as required for flight safety.

211.    For many extinguishers, Relator found that required maintenance actions were not being tracked and performed appropriately.  For example, many fire extinguishers in WinAir were tracked for "overhaul" every 5 or 6 years but it was not documented that a hydrostatic check was scheduled or conducted.  Further, when Relator checked the underlying maintenance documentation it was not documented whether maintenance had been performed.

212.    Additionally, even for those extinguishers for which an "overhaul" was being tracked, there was frequently no annual maintenance requirement triggered in the maintenance record system.  The annual check is particularly important because it ensures that the fire extinguishers are properly charged; that the extinguishers have not leaked; that the nozzles are free, clear and undamaged; and that the fire extinguisher is ready to operate in an emergency in-between long maintenance periods.

213.    Even for those tracking requirements that appeared appropriate, Relator discovered that the dates entered into WinAir for purposes of calculating required maintenance actions were frequently wrong and therefore would incorrectly indicate that maintenance was not

46

required when, in fact, the time for required maintenance had been exceeded.  All of these same problems appeared with respect to the fire extinguishers on the S-61s and the Puma 330s.

214.    Further, these problems persisted even after AAR began using its new maintenance tracking system, TRAX.  In fact, Relator found that despite the fact that several of the planes the Conformity Department had conformed had been properly tracking all fire extinguishers in WinAir, when these planes transitioned to TRAX the data was modified such that their fire extinguisher maintenance tracking provisions became incorrect.

215.    Relator reported these issues to Larry Montford (VP Maintenance), records personnel, and even in person to Art Smith, the Corporate VP of Safety and Chief Quality Officer for AAR Corp.  When nothing changed, Relator reported to the local FAA office as well as the Washington, D.C. FAA office.

216.    A similar issue exists with respect to the "fire bottles" in the C-212s.  A "fire bottle" is a non-portable fire extinguisher near the aircraft engine which can be activated by the pilot in the case of an engine fire.  The extinguishing agent is released when the pilot detonates a "squib" (a small explosive device) which sits in front of the fire bottle.  These squibs have a shelf life of 5 years or can be placed in service for 2 years, whichever limit comes first.

217.    Relator found that AAR continued Presidential's practice of failing to account for the time a squib had sat on a shelf when determining its life limit, thus causing parts to be used beyond their life limits.  For example, the squib on C-212 aircraft 969 had a July 20, 2009 date of manufacture and would have to be retired at latest by July 19, 2014.  However, it was installed on January 21, 2013, and the two years in service tracker was started on that date, allowing it to fly without warning until January 20, 2015.

218.     Additional issues with the Casa C-212 fleet identified by Relator, but not discussed in detail here, include, but are not limited to, installation of unapproved oxygen masks, failure to track required maintenance items for the unapproved oxygen masks, failure to track and document required maintenance items on combi-ops modifications, installation of an invalid engine part and unapproved cockpit recorder on C-212 aircraft N4399T, failure to track impeller and engine mount time-in-service on C-212 aircraft N605AR, failure to track the time-in-service of life-limited Devtron clock batteries on C-212 aircraft 606AR, failure to track time-in-service of the right-hand engine rotor of C-212 aircraft 961BW, and  installation of an unapproved cockpit voice recorder on C-212 969BW.

### b.     Sikorsky S-61s

219.     The Sikorsky S-61 ("S-61") is a civil variant of the "Sea King," an amphibious, anti-submarine helicopter.  It seats up to 30 passengers and can carry up to about 7,000 lbs. AAR Airlift has approximately 20 S-61's in its fleet.  The S-61s make up the largest portion of AAR's fleet and are the most active on its contracts with USTRANSCOM.  AAR inherited most of its S-61s from Presidential but purchased several independently after the Presidential purchase.

220.     Through Relator's work in the Conformity Department and then in the TRAX Department, Relator discovered that AAR was not inspecting and maintaining the S-61 fleet as required by its DOD contracts and by DOD and FAA regulations.   .

#### i.     S-61s: Failure to Track, Inspect, and Replace Landing Gear Components

221.     In 2005, the FAA issued 78-12-05, an Airworthiness Directive applicable to all S-61N aircraft (which make up the entirely of AAR's S-61 fleet).  The Airworthiness Directive

requires compliance with a Sikorsky service bulletin that mandates frequent inspection of components of the main landing gear and attaching structure for cracks.

222.    AAR is required as a condition of reimbursement under its DOD contracts and DOD and FAA regulations to comply with FAA Airworthiness Directives.  *See* 14 C.F.R. § 39.7.

223.    During the conformity of S-61 aircraft 803AR, Relator found that AAR was not properly tracking airplane usage and performing inspections as required by the Airworthiness Directive 78-12-05.

224.    For example, AD 78-12-05 requires a non-destructive inspection of certain tube assemblies after 2,300 landings and then regularly every 1,200 landings.  Relator found that there was no evidence that an initial 2,300 landing inspection had occurred on any S-61 in AAR's fleet, nor was there ongoing tracking to ensure regular inspections every 1,200 landings.

225.    Similarly, another section of AD 78-12-05 requires that certain fitting assemblies be inspected for cracks *every 15 hours* of use.  This requirement was addressed via AAR's CAMP by requiring a daily check of the parts.  However, this required check frequently was not tracked.  Therefore, there was no documented record that the check was being performed daily as required.

226.    Similar failures to track and ensure performance of inspections required by the Airworthiness Directive exist across almost all parts addressed by the Directive.

227.    Relator reported this issue to VP of Maintenance, Larry Montford, in February 2013.  In October 2013, at the request of Tom Howell, VP of Quality, Relator sent reports regarding this issue to Anthony Leal, Director of Technical Services, as well.  To Relator's knowledge, no action was ever taken to correct these issues.

ii.     *S-61s: Failure to Properly Track S-61 Input Freewheel Unit Assemblies*

228.     "Input freewheel unit" ("IFWU") assemblies act as a transmission clutch between the S-61 engines and the main gearbox, engaging and disengaging depending on engine and rotor speed. There is one IFWU assembly for each engine. The IFWUs allow the helicopter to enter autorotation in case of engine power loss or loss of drive to the main transmission. The IFWU's, when being heavily used, can slip, leading to loss of power and control over the helicopter.

229.     Lifting operations expose the IFWU assemblies to significantly more stress and wear than normal operations. Therefore, IFWU assemblies used in extensive lifting operations (known as "REL" operations) wear out faster and have shorter life limits. To address this issue, in January 2007, the FAA adopted an extensive Airworthiness Directive regarding the tracking and overhaul of the main gearbox S-61 IFWUs.

230.     AAR is required as a condition of reimbursement under its DOD contracts and DOD and FAA regulations to comply with FAA Airworthiness Directives.

231.     The FAA mandated, through AD 2007-01-05, that S-61 operators begin counting and recording the number of external lift cycles performed by an aircraft each day as well as its time in service. (A "lift cycle" is the lifting of an external load followed by release of the load.) These values were to be tracked for each input freewheel unit assembly separately so that if a part were moved from one aircraft to another its usage history would follow.

232.     Using this recorded data, the FAA requires operators to perform 250-hour time-in-service moving averages of usage of the part to determine if it qualifies as being used in "Repetitive External Lift" ("REL") operations. The initial 250-hour average is calculated by dividing the total number of lift cycles by 250 (the total time in service). If this computation results in more than 6 cycles per hour, the assembly is deemed an REL assembly and must be

50

marked as REL.  If the initial 250-hour average is below 6 cycles per hour, the operator must continue to perform these calculations every 50 hours.

233.    Input freewheel units used in REL operations require more frequent inspection and replacement of parts.  If at any point after calculating cycles per hour, it is determined that the assembly meets REL requirements, it must be marked as such and becomes subject to the inspection and replacement requirements for parts used in REL operations.

234.    Relator found that AAR tracks the lifts by airframe rather than assembly part as is required by the Airworthiness Directive.  Given that there are two IFWUs on each aircraft and they are moved regularly, this creates a multitude of problems, including making it impossible to accurately calculate the lift cycle average for parts when they were moved from one plane to another.

235.    Relator also found that even when IFWU parts were found to be REL status, they were not treated as such.  For example, when S-61 aircraft number 616CK was conformed, both IFWUs were found to be REL.  However, according to the WinAir maintenance system, they were being treated as if they were not REL.

236.    Although Relator knows that AAR has had REL IFWUs in use, a review of the WinAir maintenance system shows every helicopter on a 50 hour interval for calculating the lift-cycle average.  This shows that IFWU assemblies are being treated as non-REL and AAR is not implementing the appropriate inspection and replacement limits required by the FAA Airworthiness Directive.

237.    Perhaps most concerning, Relator has reason to believe that AAR is not properly recording its external lifts during operations.  Nate Hill, Manager of Rotor Wing Maintenance, would often laughingly say, with a wink and a nod, "We're not an REL operator."

238.    AAR's failure to record external lifts accurately, and to track and perform maintenance and replacement of the IFWU assemblies in accordance with the FAA Airworthiness Directive, violates the conditions of eligibility to do business with DOD and conditions of payment under its DOD contract.

239.    Relator reported this issue to the Washington, D.C. and local FAA offices in April 2014.

c.    *Puma 330s*

240.    The SA 330J Puma *(*"Puma 330") is a four-bladed, twin-engine medium-transport helicopter.  It can seat up to 16 passengers and carry about 7,600 pounds.  AAR has nine Puma 330s in its fleet, all of which it inherited from Presidential.  AAR operates four to six of these helicopters at any given time.  These aircraft are used mainly on AAR's vertical replenishment contracts with the Military Sealift Command.

241.    Relator identified several significant maintenance issues that made all of the Puma 330's in AAR's fleet materially noncompliant.

i.    *Puma 330s: Deactivation of Required Cargo Hook Emergency Release System*

242.    The Puma 330s have several cargo emergency release systems that allow immediate release of cargo the aircraft is carrying: an electronic system in the cockpit (available to the pilot and co-pilot), a cartridge "squib" system in the cockpit (also available to the pilot and co-pilot), and a manual system in the cargo-hold.  Emergency release of cargo is necessary in the case of engine failure, if there is a need to quickly reduce the weight of the craft, or if the dragline gets caught.

243.    Upon request, FAA approved moving the manual system from the cargo-hold to the cock-pit (on the pilot's side) on AAR's Puma 330s.  But around May 2014, Relator

discovered that in addition to this modification, the cartridge release system installed in the cockpit had been *deactivated* on all of the operating Puma 330s in AAR's fleet (likely because the life-limited squibs necessary for operation of the release are expensive and can be hard to procure).

244.    This was a major modification to the aircraft.  It significantly affects the ability of the pilots and crew to activate emergency releases.  After deactivation of the squib system, the *only* emergency release system available to the co-pilot or crew is the electronic system.  If this system were to go down for any reason, the co-pilot and crew would have no way to activate the emergency release as they would not be able to activate the manual release system next to the pilot.

245.    Even though this is a major alteration, Relator found that the FAA had not been informed of this modification and FAA's approval had not been sought as required.  Instead, the cargo release system had been deactivated based on a fleet campaign directive.  A fleet campaign directive ("FCD") is an internal mechanism an aircraft operator may use to institute a policy change or maintenance request across a fleet of aircraft.  FAA does not require that FCDs be reported.

246.    According to the FCD, the systems were deactivated on all operating Puma 330s and placards were placed in the cockpits indicating that the cargo hook emergency function had been inhibited.

247.    However, the Aircraft Flight Manual ("AFM") for the Puma 330s had not been updated to indicate: (1) that the manual release system had been moved; or (2) that the cartridge system in the cockpit had been deactivated.  The AFM is the flight crew's operating guide and,

without the update, the pilot and crew would not know their options for effectuating an emergency cargo drop.

248.    AAR also failed to implement the operational requirements imposed by the Puma 330 manufacturer, Eurocopter, when it approved deactivation of the emergency release system. In granting its approval to deactivate the squib system, Eurocopter imposed several specific maintenance and operations requirements.  Specifically, before each hook operation, an electrical test release and mechanical control release had to be performed.  AAR failed to incorporate these requirements into its AFM or other operational guidance documents.  In addition, the Eurocopter letter required that AAR inform local FAA authorities about the agreement.

249.    Relator raised this issue with his supervisor Ryan Knight on May 20, 2014. Concerned, based on his past experience, that he would not receive a response, he also raised the issue with the local FAA office.  The local FAA officer with whom Relator had been corresponding responded by asking whether Relator had made a formal complaint regarding this issue or escalated it to Larry Montford (Vice President of Maintenance and Engineering) or John Gill (Director of Maintenance).  Relator responded that he had previously been prohibited from raising issues with anyone except his direct supervisor, Ryan Knight, including through the company's safety reporting system, APRISE.

250.    About a week later, Relator was approached by Tom Howell (VP of Quality and Safety) who said that the FAA had questioned him about Relator's ability to report on safety and compliance issues through all available company means.  Howell stated that from then on Relator would be permitted to report on safety issues through any means in accordance with company policy.  On the same day, Relator reported the issue with the deactivation of the emergency release system through the APRISE system.

251.    Based on information and belief, and reasonable investigation, AAR has not sought approval from the FAA for this alteration and has not implemented the manufacturer requirements for maintaining airworthiness with these alterations to the aircraft in violation of its DOD contracts and DOD and FAA regulations.

ii.    *Puma 330s: Failure to Track Major Assemblies in accordance with Manufacturer Overhaul Requirements*

252.    According to Puma 330 manufacturer requirements contained in the "Airworthiness Limitations" section of its manual, certain key mechanical components of the helicopter, such as the main rotor hub, shaft assembly, main gear box, intermediate gear box, and tail rotor transmission system, must be overhauled every eight (8) years or 1,500-3,000 flight-hours, when operated in a salt-laden or humid and tropical atmosphere (they must be overhauled every 12 years otherwise).  AAR's Puma 330s fly over the ocean and are stored in ship hangars and thus are subject to the lower 8 year requirement.

253.    The Puma manufacturer includes a time limit based on calendar years because of the need for overhaul due to environmental factors that can compromise these aircraft components and the airframe even without reaching the time in flight requirements.  Salt is known to compromise aircraft components and airframes.  Therefore, overhaul is necessary based in large part on the circumstances of operation and storage, not just volume of usage.

254.    Relator found during his review of Puma 330 parts that the overhaul requirement for these parts had been updated in the WinAir system to require overhaul every twenty-four (24) years instead of every eight (8) years.

255.    AAR has allowed the overhaul requirement to be set at twenty-four years even though AAR clearly understood that the overhaul was required every eight years.  The WinAir system notes for affected parts that a maximum of eight years may pass between overhauls.  In

March 2013, AAR received approval from the Puma manufacturer to postpone the eight year overhaul scheduled for March 21st to June 30th of the same year (provided that local authorities were informed of the postponement), demonstrating the company's knowledge that even small deviations from the eight year schedule required manufacturer approval.

256.     Although AAR also tracked these parts based on hours of flight, it did not use the planes often enough to trigger the overhaul requirement before the overhaul based on years would be triggered.  AAR only uses these planes approximately ten hours a month (or 120 hours a year).

257.     As a result of the twenty-four year overhaul limit, several of the Puma 330 parts have already gone, or will soon go, over eight years without a required overhaul.  For example, the main gearbox assembly on aircraft 330KW was last overhauled on April 1, 1998, making it now 9 years overdue.  The tail rotor transmission on the same aircraft was overhauled in March 2004, making this part about 3 years overdue.  The main rotor hub assembly on aircraft 504R was last overhauled on September 29, 2004, making it over 2 years overdue.  The tail rotor transmission on aircraft 2783R was overhauled in October 2005, making it over a year past due. The main rotor hub assembly on aircraft N10248 and the intermediate gearbox on aircraft 10248 came due for overhaul in February 2015.  Given the current 24 year tracking, it is highly likely that these planes have overflown their required overhaul dates.

258.     Relator reported this issue to his supervisor Ryan Knight and to the records department in June 2014, and reported it to the local FAA office when he received no response.

iii.iii.     *Puma 330s: Failure to Track and Retire Life-Limited Engine Components*

259.     In mid-2014, during Relator's review of the parts installed on AAR's Puma 330s, he found that all of the engine mounting struts (4 per aircraft), engine attach fittings (4 per

aircraft), and engine mounting strut bolts (8 per aircraft) on the Puma 330s in the fleet were not being tracked.  These parts are all life-limited per manufacturer Airworthiness Limitations maintenance requirements.

260.    Based on Relator's review of the WinAir system, AAR did not have a documented record of what part numbers or serial numbers for each of these part-types were installed on the Puma aircraft or how long they had been installed in accordance with FAA regulations.

261.    Relator reported this issue to his supervisor, Ryan Knight, and to the local FAA office, in June 2014.

*iv.iv.*    *Puma 330s: Failure to Track Life-Limited Crew Belts and Harnesses*

262.    In June of 2014, while conducting a review of parts installed on the AAR Puma 330s, Relator found that while the Puma 330 seat belts and harnesses are life-limited according to the manufacture's maintenance program, WinAir was not tracking these parts for retirement on any of the Puma aircraft.  A note in WinAir, entered in mid-2013 by an AAR Rotor Wing Technical Services Support Representative, stated that AAR was aware of the lack of tracking and an investigation would be conducted.  As of Relator's review of the WinAir system in June 2014, no corrective action had been taken.

263.    Relator reported this issue to his supervisor, Ryan Knight, on June 23, 2014. Relator also reported this issue through AAR's safety reporting system, APRISE, and included documentary evidence that the parts were not being tracked.  Relator's employment was terminated shortly after these reports were made.

*v.*      *Puma 330 N10248: Failure to Track and Retire Life-Limited Main Gearbox Supports*

264.    There are three main gear box supports on the Puma 330 that support the main gear box ("MGB").  The MGB is the unit that distributes mechanical power to nearly every part of the aircraft, including the main rotor head (that turns the main rotor blades and tail rotor blades) and the hydraulic system.  Short of failure of the main rotor blades, failure of the MGB is the most catastrophic failure that can occur on a helicopter.  Even if the engines are producing power, a failure of the MGB will result in a loss of power to the rotor blades.

265.    The Puma manufacturer's maintenance manual, requires that main gearbox supports must be retired at 20,000 hours of flight time.  During his review of AAR's Puma aircraft, Relator discovered that aircraft number N10248 showed *no tracking* for several of the craft's gearbox supports.

266.    Relator reported the issue again in the Spring of 2014 when he sent his supervisor Ryan Knight a comprehensive list of issues relating to the Puma fleet.

267.    When Relator reviewed the tracking of these life-limited components in June 2014 and found that no corrective action had been taken, he reported the issue to the local FAA office.

268.    Additional issues Relator has personal knowledge of include, but are not limited to, the failure to comply with Airworthiness Directives governing the maintenance of Puma tailbooms, and the improper installation of numerous parts identified by Relator during his parts validation of the fleet.

**B.  AAR's Conduct Has Resulted in Submission of False or Fraudulent Claims Under DOD Contracts with U.S. Transportation Command and Military Sealift Command and Submission of False or Fraudulent Claims is Ongoing**

269.  Defendants' contracts require, as a material condition of reimbursement, compliance with all DOD and FAA regulations intended to ensure that aircraft used to transport United States troops and cargo are airworthy and have been  inspected and maintained in accordance with DOD and FAA regulations including the requirement to track and replace life-limited parts.

270.  In addition, DOD regulations require that only air carriers that satisfy DOD quality and safety regulations for air transport, including all inspection and maintenance requirements, are eligible to do business with DOD for any air transport contracts.  Failure to adhere to DOD's quality and safety regulations for air carriers may result in revocation of eligibility to contract with DOD for airlift services.

271.  AAR's failure to comply with material conditions of eligibility for doing business with DOD and material conditions of reimbursement under its contracts with DOD renders each claim presented to DOD a false or fraudulent claim presented in violation of the federal False Claims Act.  31 U.S.C. § 3729(a)(1)(A).

272.  AAR also made false statements material to the false or fraudulent claims presented to DOD, U.S. Transportation Command in violation of 31 U.S.C. § 3729(a)(1)(B). These false statements include misrepresentations made to DOD personnel that aircraft were "mission ready."

273.  On information and belief, and based on reasonable investigation, Relator alleges that AAR's conduct is ongoing and that AAR has not ceased the violations of law described herein.

C.    **AAR Retaliates Against Relator and Terminates His Employment**

274.    Throughout his employment, Defendants repeatedly retaliated against Relator for his attempts to stop violations of SOX and the FCA.

1.    Defendants Retaliated Against Relator for Issuing Internal Safety and Compliance Reports by Issuing Relator Meritless Warnings

275.    AAR retaliated against Relator by issuing him meritless disciplinary warnings based on the protected activities he engaged in from February 2013 through May 2013, as described above in paragraph 152.

276.    Within a few weeks of the e-mails Relator sent to AAR senior officials in May 2013, AAR management began issuing Relator meritless disciplinary warnings as a means of retaliation.  On June 5, 2013, Marc Gendron, the Deputy Director of Maintenance, issued Relator a baseless "First Written Warning" for requesting time off through Mr. Leal rather than sending the request to Mr. Knight.

277.    On June 13, 2013, Relator received a "Second Written Warning," allegedly for insubordination.  The warning accused Relator of "shouting unprofessionally" at Mr. Gendron in response to his "First Written Warning."  Relator had not shouted or raised his voice to Mr. Gendron, and had behaved professionally at all times.  Another employee took notes of the event and specifically wrote that the parties discussed the "First Written Warning" in a "professional manner."

278.    During this time period, Mr. Knight acted in an extremely hostile manner to Relator, and all but conceded that the hostility was due to Relator's protected disclosures regarding safety concerns and compliance obligations.  On June 21, 2013, Mr. Knight approached Relator in a physically aggressive fashion asking, "Do you have a problem? What's your problem?"  When Relator responded that he did not have a problem, Mr. Knight replied, "I

don't like your attitude.  You're not going to be the compliance guy for the whole company.  Just

do your damn job."  He then reiterated to Relator "I don't like your attitude.  You're pissing me

off."

2.  <u>Relator Was the Only Member of the Conformity Division to Receive a
Demotion and a Pay Cut as a Result of the Transfer to the TRAX Division</u>

279.   AAR retaliated against Relator by issuing him a demotion and a pay reduction

based on the protected activities he engaged in during the months of February through May

2013, as described above in paragraph 152.

280.   On January 24, 2013, before Relator had engaged in the above-referenced

protected activities, Mr. Leal, AAR Airlift Director of Technical Services, held a meeting to

inform the employees of the Conformity Division of the Company, where Relator had been

assigned, that the Company intended to eliminate their department.  Mr. Leal stated that the

Company would post open positions from another department, the TRAX Division, and intended

to fill the positions with Conformity Division team members.  Mr. Leal further advised the

employees that the transfer would not result in a pay reduction for any of the affected employees.

281.   On January 31, 2013, Mr. Montford, AAR Airlift VP of Maintenance, held

another meeting with Conformity Division personnel to discuss the transfer to TRAX Division

positions.  During the meeting, Relator and Mr. Knight raised concerns that some positions

within the TRAX Department, such as the CDM Analyst position, require an Airframe and

Power Plant license ("A&P license").  Mr. Montford acknowledged that Conformity Division

personnel were sufficiently qualified for the CDM Analyst position and agreed to waive the A&P

license requirement for the CDM Analyst position.

282.   Throughout April 2013 and May 2013, while he was engaging in the above-

referenced protected activities, Relator interviewed for three different positions within the TRAX

61

Department: TRAX Manager, CDM Analyst and TRAX Analyst.  The TRAX Manager and

CDM Analyst positions represented a lateral move for Relator in terms of pay and experience

level.  Relator was especially well-qualified for the role of CDM Analyst.  Ryan Knight,

Manager of Conformity even recommended Relator for this position.  On January 30, 2013, Mr.

Knight wrote of Relator's work in recommending him for the CDM position: "[he] has

consistently delivered quality in his work including, but not limited to decision making,

leadership and organizational skills. His current position was posted as requiring an A&P and

though without this rating he excelled in all required duties. I know the same circumstances will

occur in this positon. He is an asset to the Airlift team."

283.    On June 11, 2013, a few weeks after he sent emails to AAR senior officials in

May 2013 reporting his safety and compliance concerns, Melanie Naylor, the Recruitment

Manager, informed Relator that he was being offered a transfer to a TRAX Analyst position.

The transfer to a TRAX Analyst position constituted a demotion and pay cut from Relator's prior

position as a Conformity Specialist.  Relator notified Ms. Naylor that the TRAX Analyst position

would result in a pay cut from $57,844 per year as a Conformity Specialist to $53,560 as a

TRAX Analyst, and reminded Ms. Naylor that Mr. Montford informed his team that no one

would receive pay cuts as a result of the transfer.  Ms. Naylor dismissed Relator's concerns and

directed Relator to accept or decline the offer by the end of the day.

284.    At the time, two CDM Analyst positions, which Mr. Leal had previously

acknowledged Relator was qualified for, remained open.  AAR did not offer Relator either of

these two open positions.  When Relator asked whether he could transfer into the CDM Analyst

position rather than the lower-level, lower-paying TRAX Analyst position, AAR refused to

transfer him into that position.

285.    Relator reluctantly accepted the TRAX position.  Relator subsequently learned that he was the only employee from the former Conformity Division to receive a pay cut and/or demotion as a result of the transfers.

### 3.    Defendants Interfered with Relator's Ability to Secure another Position with the Company

286.    AAR retaliated against Relator by interfering with his ability to secure another position with the Company as a result of the protected activities he engaged in during February 2013 through September 2013, as described above in paragraphs 152 and 157-168.

287.    On July 18, 2013, Relator reapplied for an open CDM Analyst position and an open Flight Operations position.  Relator was well qualified for both positions.

288.    On August 8, 2013, two days after he sent an email to Messrs. Skelly and McGillivray informing them that he intended to take his safety and compliance concerns outside of the company, Relator inquired with Melanie Naylor, the Recruitment Manager, as to the status of his application for the CDM Analyst position.  Ms. Naylor responded that the Company had not started the interview process.  However, on August 15, 2013, Mr. Leal informed Relator that AAR had just hired a candidate for the CDM Analyst position, and that that person was scheduled to begin on August 19, 2013.  This indicated that, contrary to its representations, the Company did in fact conduct interviews for the position throughout the month of August 2013.  Despite his excellent qualifications, AAR neither hired nor even interviewed Relator for the position.

289.    During September 2013, shortly after Relator filed his initial FAA and OSHA charges, Ms. Naylor, Mr. Leal and Mr. Knight each informed Relator that AAR had not selected him for an interview for a CDM Analyst position because he did not have an A&P license.

However, Mr. Montford had explicitly stated that A&P licenses were not required for CDM Analyst positions for former employees of AAR's Conformity Division, such as Relator.

290.     In retaliation for his protected conduct, AAR also interfered with Relator's ability to obtain the Flight Operations position.  On September 16, 2013, Ms. Naylor offered Relator an interview for the position.  Later that day, however, she retracted the offer and informed Relator that she would repost the position and that he would need to reapply for the position once it was reposted.  Eight months later, on May 2, 2014, Ms. Naylor informed Relator that he would not be considered for the position.  Relator was well-qualified for this position. The position required knowledge of weather theory, charts and reports, one year of aviation experience, and knowledge of Federal Aviation Regulations, particularly parts 91 and 135. Preferred experience included a B.S. from an accredited college or university, an FAA Dispatcher license and three years of aviation experience.  Relator easily met both the required and preferred experience levels.  In addition, Relator has been an FAA licensed Dispatcher since 1996 and was employed as a Dispatcher for three Part 121 airlines. Relator also previously worked in a position equivalent to that of a Flight Operation Coordinator for a Part 135 carrier for several years.  Relator later discovered that in the time between the position being retracted and Relator being told that he would not be considered, AAR never reposted the position but interviews were conducted and the position was filled.

4.     Defendants Harassed and Threatened Relator for Reporting his Safety and Compliance Concerns

291.     AAR retaliated against Relator by harassing him based on the protected activities he had engaged in previously, as described above in paragraphs 152 and 157-168.

292.     On October 9, 2013, a day after he sent Ms. Goodpaster his second report raising safety and compliance concerns, Art Smith, AAR's Corporate Vice President, requested a

64

meeting with Relator.  Relator requested access to the AAR record systems in order to validate his concerns and prepare for the meeting.  Mr. Smith approved the request.

293.     Later that day, on October 9, 2013, Mr. Knight, Mr. Howell and Mr. Leal interfered with Relator's ability to prepare for the upcoming safety and compliance meeting. After they learned that Mr. Smith had granted Relator access to the Company's record system, Mr. Leal. Mr. Howell and Mr. Knight immediately revoked Relator's access to those systems. Mr. Leal also instructed Relator that he needed to send a written request to Mr. Knight if he needed access to such Company records in the future.

294.     On October 15, 2013, Relator attended the meeting with Mr. Smith and Mr. Howell to discuss the safety and compliance issues that he had raised in his reports to Ms. Goodpaster.  Throughout the meeting, Mr. Howell reprimanded Relator for voicing his concerns to Ms. Goodpaster, since she worked for the parent company, AAR, rather than for AAR Airlift. Mr. Howell admonished Relator to keep his safety-related concerns "internal" in the future.  Mr. Howell also stated that Relator had acted insubordinately by not copying Mr. Leal or Mr. Knight on his email to Mr. Montford in February 2013.  Mr. Howell then commented that, "people get very upset when you voice your concerns outside of AAR Airlift Management."

295.     During the meeting, Mr. Knight also instructed Relator to copy him on every email that Relator sent outside of the TRAX Department going forward, in order to monitor his communications.  The next day, on October 16, 2013, when Relator asked for clarification on the policy, Mr. Knight responded, "It doesn't seem like anyone else struggles with the concept of chain of command."

296.     On October 21, 2013, Relator attended a meeting with Mr. McGillivray and Mr. Knight.  Mr. McGillivray and Mr. Knight again reprimanded Relator for having sent the safety and compliance report to Ms. Goodpaster.

297.     Later that day, on October 21, 2013, Relator received a "Final Written Warning" for reporting his safety and compliance concerns to Ms. Goodpaster.  The "Final Written Warning" characterized his report to Ms. Goodpaster as a "gross violation" of the company's chain of command procedure.  Relator was advised that any additional occurrences of "unacceptable behavior" could result in further disciplinary action, including termination.

298.     AAR also openly "blacklisted" Relator from the TRAX Division for reporting his safety and compliance concerns.  On October 17, 2013, Luke DeShazo, the S92 Helicopter Program Manager, told Relator that he had been "blacklisted" by the Company and that "everybody is talking shit about you."  Mr. DeShazo informed Relator that several managers and employees warned him not to interact with Relator because "he is going to the Feds and anyone else who will listen" to report AAR's safety and compliance issues.  Mr. DeShazo further stated that the Company's President, Randy Martinez, is a "bully," and that "everybody knows of the issues that [Relator] had brought forward to management and that nobody wants to acknowledge or fix them."  Mr. DeShazo remarked that he was not surprised by the retaliation that Relator was facing by the Company for reporting the compliance issues to AAR Corporate.

299.     As Mr. DeShazo indicated, after his reports to Ms. Goodpaster in September 2013 and October 2013, Relator was effectively blacklisted by AAR throughout the rest of his tenure with AAR.  Relator was isolated from his colleagues and given inconsequential assignments as a means of restricting his access to the company records systems.

5.      Defendants Isolated Relator and Eventually Terminated His Employment
        for Reporting his Safety and Compliance Concerns

300.    AAR retaliated against Relator by isolating him from the TRAX department and eventually terminating his employment in retaliation for his protected activity, as referenced above in paragraphs 152 and 157-168.

301.    On June 26, 2014, Relator attended a performance appraisal with Mr. Knight where Mr. Knight explicitly stated to Relator that he believed Relator filed his OSHA charge because he was "just looking for money."  Relator received a low score of 2.60, indicating that his work was "below expectations," on his annual performance review by Mr. Knight.  This score was based on the subjective assessment of Mr. Knight.

302.    On July 2, 2014, three days after Relator filed a supplemental charge with OSHA, Mr. Leal and Mr. McGillivray approached Relator upon his arrival at work and asked him to come into a visitor's area.  Mr. Leal informed Relator that his position was being terminated due to a reduction in force.

303.    Relator subsequently learned that Amy Penwell and Cobrina Ashbury, two other TRAX Analysts, were also terminated on or around June 2, 2014.  Relator came to learn, however, that Mr. Leal contacted Ms. Ashbury only about a week after her termination and offered her a new position with the company, which she accepted.  Relator is not aware of Ms. Penwell's employment status.  AAR did not offer Relator any re-employment options or positions even though the Relator has applied for other positions for which he is well qualified, including an AOG Expeditor position in October 2014 and Tech Records Specialist position in September 2014.

304.    AAR later claimed that Relator's termination was due in part to completion of the project transitioning the company to the TRAX system.  Contrary to this statement, the TRAX

Analysts had not finished entering the required data into the TRAX system.  Many fleets were still not entered into the system and were scheduled to be entered by the TRAX Analysts in the future.  In addition, AAR had never informed Relator that the TRAX Analyst position was considered a temporary one, including at the time of his transfer to that position.

305.    AAR also claimed at a later date that Relator's termination was due in part to the expiration of several DOD contracts.  As a result, AAR has claimed, the TRAX project required fewer personnel to tend to the aircraft.  Relator believes that his work would not have been affected even if it is true that a number of aircrafts were taken out of circulation due to the expiration of DOD contracts.  As a TRAX Analyst, Relator was responsible for, among other things, auditing time limits of manual revisions in relation to maintenance requirements to ensure accurate maintenance forecasting.  This work was required for aircrafts that were both in and out of circulation, and should have been performed on the aircrafts that were allegedly coming out of circulation.

## Count I

## Violation of the False Claims Act

## 31 U.S.C. §§ 3729(a)(1)(A)-(B)

306.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 305 above as though fully set forth herein.

307.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 as amended.

308.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

309.   By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims.

310.   The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

311.   By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

312.   Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## COUNT II

### Violation of the False Claims Act

### 31 U.S.C. § 3730(h)

313.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 305 of this Complaint.

314.   Under 31 U.S.C. § 3730(h)(1), it is unlawful to discharge, demote, threaten, harass, or otherwise discriminate against an employee, contractor, or agent in the terms and conditions of employment "because of lawful acts done by the employee, contractor, or agent" in furtherance of a *qui tam* suit or "other efforts to stop 1 or more violations of" the FCA.

315.   For purposes of 31 U.S.C. § 3730(h)(1), Relator was an employee of AAR.

316.   Relator had a reasonable belief that Defendants were not complying with numerous DOD and FAA requirements regarding maintaining its aircraft in airworthy, safe, and mission-capable as required by contract and were defrauding the United States Government in

violation of the FCA, and were engaged in active and intentional efforts to hide this unlawful conduct from the United States Government.

317.    Relator engaged in protected activity under 31 U.S.C. § 3730(h)(1) when, by lawful acts, he consistently and repeatedly opposed, protested, and attempted to stop Defendants' violations of DOD and FAA  regulations and of the FCA.  Relator reported the maintenance and airworthiness issues he had identified to the FAA.

318.    Relator took these actions in furtherance of a *qui tam* suit and in an effort to stop one or more violations of the FCA.

319.    AAR knew that Relator had engaged in these instances of protected activity.

320.    AAR retaliated against Relator for engaging in these instances of protected activity by demoting him from the position of Conformity Specialist to TRAX Analyst, by interfering with his ability to secure other positions within the Company, by threatening and harassing Relator for reporting violations of the FCA, and by ultimately terminating his employment.

321.    AAR's actions have caused and will continue to cause Relator substantial economic loss, including lost salary, benefits, and bonus payments, and damage to his career prospects and earnings potential; damage to his professional reputation; humiliation; emotional distress; and pain and suffering.

322.    By these actions, AAR has violated 31 U.S.C. § 3730(h)(1).

323.    Pursuant to 31 U.S.C. § 3730(h)(2), Relator is entitled to all relief necessary to make him whole for AAR's retaliation, including reinstatement (or front pay, in lieu of reinstatement), two times the amount of back pay, interest on the back pay, and compensation for

any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## COUNT III

### Violation of the Sarbanes Oxley Act

### 18 U.S.C. § 1514A

324.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 305 of this Complaint.

325.    Under the anti-retaliation provision of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A, it is unlawful for an employer to discriminate against an employee for providing information, which the employee reasonably believes constitutes a violation of any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information is provided to a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).

326.    On a number of occasions, Relator engaged in protected activity under SOX by investigating aircraft maintenance, safety, and legal compliance issues, and by reporting his concerns to Company management, federal regulators, and others.

327.    AAR is obligated to comply with relevant aircraft maintenance regulations and contracts in order to receive compensation for their services from the DOD.  AAR violated the relevant aircraft maintenance regulations and contracts and thereby filed fraudulent claims with the DOD.  AAR's fraudulent filing with the DOD had the potential to significantly reduce the value of the Company, which would negatively affect shareholders.

328.     AAR knew that Relator had engaged in protected activity, as he consistently reported numerous significant safety and compliance issues to AAR from February 2013 through June 2014.

329.     AAR took an adverse employment action against Relator by demoting him from the position of Conformity Specialist to TRAX Analyst, by interfering with his ability to secure other positions within the Company, by threatening and harassing Relator, and by ultimately terminating his employment.

330.     The Company's actions have caused and will continue to cause Relator substantial economic loss, including lost salary, and damage to his career prospects and earnings potential; damage to her professional reputation; humiliation; emotional distress; and pain and suffering.

331.     By these actions, AAR has violated 18 U.S.C. § 1514A.

332.     Relator exhausted his administrative remedies by filing a complaint of discrimination with OSHA prior to filing this lawsuit.

## COUNT IV

## Violation of the Dodd-Frank Wall Street & Consumer Protection Act

## 15 U.S.C. § 78u-6(h)(1)

333.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 305 of this Complaint.

334.     Under the anti-retaliation provision of the Dodd-Frank Wall Street & Consumer Protection Act ("Dodd-Frank"), 15 U.S.C. § 78u-6(h)(1), it is unlawful for an employer to discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any

lawful act done by the whistleblower, including making disclosures that are required or protected under the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A.

335.    Relator engaged in protected activity under SOX by investigating aircraft maintenance, safety, and legal compliance issues, and by reporting his concerns to Company management, federal regulators, and others.

336.    AAR is obligated to comply with relevant aircraft maintenance regulations and contracts in order to receive compensation for their services from the DOD.  AAR violated the relevant aircraft maintenance regulations and contracts and thereby filed fraudulent claims with the DOD.  AAR's fraudulent filing with the DOD had the potential to significantly reduce the value of the Company, which would negatively affect shareholders.

337.    AAR knew that Relator had engaged in protected activity, as he consistently reported numerous significant safety and compliance issues to AAR from February 2013 through June 2014.

338.    AAR took adverse employment actions against Relator for engaging in protected conduct by demoting him from the position of Conformity Specialist to TRAX Analyst, by interfering with his ability to secure other positions within the Company, by threatening and harassing Relator, and by ultimately terminating his employment.

339.    The Company's actions have caused and will continue to cause Relator substantial economic loss, including lost salary, and damage to his career prospects and earnings potential; damage to his professional reputation; and consequential losses.

340.    By these actions, AAR has violated 15 U.S.C. § 78u-6(h)(l).

## COUNT V

### Violation of the Florida Whistleblower Act

### F.S.A. § 448.102

341.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 305 of this Complaint.

342.   Under the private-sector Florida Whistleblower Act, F.S.A. § 448.102, an employer may not take any retaliatory personnel action against an employee because that employee objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.

343.   Similarly, under the Florida Whistleblower Act, an employer may not take any retaliatory personnel action against an employee because the employee has disclosed, or threatened to disclose, to any appropriate governmental agency an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation.  Employees that report the activity, policy, or practice to their supervisors in writing and give them reasonable opportunity to correct the activity, policy, or practice are entitled to protection under the Act.

344.   Relator is entitled to protection under the Florida Whistleblower Act because, on a number of occasions, he objected to, or refused to participate in, activities, policies, and/or practices of AAR which were in violation of law, rule, and/or regulations.  He is also entitled to protection because he reported safety and compliance issues to members of AAR management in writing on numerous occasions, before then filing complaints with the FAA and with OSHA.

345.   In response to his protected activity, AAR took retaliatory employment actions against Relator.  AAR retaliated against Relator by demoting him from the position of Conformity Specialist to TRAX Analyst, by interfering with his ability to secure other positions

within the Company, by threatening and harassing Relator, and by ultimately terminating his employment.

346.     The Company's actions have caused and will continue to cause Relator substantial economic loss, including lost salary, and damage to his career prospects and earnings potential; damage to his professional reputation; humiliation; emotional distress; and pain and suffering.

347.     By these actions, AAR has violated F.S.A. § 448.102.


**PRAYER**

WHEREFORE, Plaintiff-Relator Christopher Harvey prays for judgment against the Defendants as follows:

348.     That Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 -33;

349.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

350.     That Plaintiff-Relator Harvey be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

351.     That Plaintiff-Relator Harvey be awarded the maximum amount allowed pursuant to  § 3730(h) of the False Claims Act;

352.     That Plaintiff-Relator Harvey be awarded all costs of this action, including attorneys' fees and expenses;

353.    That Plaintiff-Relator Harvey be awarded all relief necessary to make him whole pursuant to 18 U.S.C. § 1514A(c);

354.    That Plaintiff-Relator Harvey be awarded the maximum amount allowed pursuant to F.S.A. § 448.103;

355.    That Plaintiff-Relator Harvey be awarded the maximum amount allowed pursuant to 15 U.S.C. § 78u-6(h)(C); and

356.    That Plaintiff-Relator Harvey recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure,. Plaintiff-Relator Harvey hereby demands a trial by jury.

Dated:  April 8, 2015

By: _____

Anand Swaminathan
anand@loevy.com
Vince Field
vince@loevy.com
LOEVY & LOEVY LLP
312 N. May St. #100
Chicago, IL 60607
Tel: (312) 243-5900

Colette G. Matzzie
cmatzzie@phillipsandcohen.com
Molly B. Knobler
mknobler@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Ave, NW
Washington, DC 20036

Tel: (202) 833-4567
Fax: (202) 833-1815

Claire M. Sylvia
csylvia@pcsf.com
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Avi Kumin
kumin@kmblegal.com
KATZ, MARSHALL AND BANKS, LLP
1718 Connecticut Ave. NW, 6th
Washington, DC 20009
Tel: (202) 299-1140


Attorneys for Plaintiff-Relator
Mr. Christopher Harvey